[No. S167051. July 29, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
RODRIGO PEREZ, Defendant and Appellant.

## COUNSEL

Eric R. Larson, under appointment by the Supreme Court, and David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson, Larry M. Daniels and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Defendant fired a single bullet at a distance of 60 feet, from a car going 10 to 15 miles per hour, at a group of seven peace officers and a civilian who were standing less than 15 feet apart from one another in a dimly lit parking lot late on the night in question. There was evidence that defendant believed he was shooting at a group of rival gang members, but no evidence he was targeting any particular individual when he fired at the group. The bullet hit one officer in the hand, nearly severing his finger, but killed no one. The jury returned special findings that defendant knew or reasonably should have known that the victims were peace officers, and convicted defendant of, among other crimes, seven counts of premeditated attempted murder of a peace officer and one count of premeditated attempted murder (the civilian victim).

The Court of Appeal reasoned that the jury could find on this evidence that "the officers' proximity to each other was such that in intending to kill any of the officers defendant's shooting endangered the lives of all." On that basis, the court affirmed defendant's convictions of eight counts of attempted murder. But shooting at a person or persons and thereby endangering their lives does not itself establish the requisite intent for the crime of attempted murder. "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176].) We granted review to determine whether, on these facts, sufficient evidence supports the multiple convictions of attempted murder where no particular individual was being targeted, and one shot was fired at the group, striking a single officer.

We conclude the evidence is sufficient to sustain only a single count of premeditated attempted murder of a peace officer. "The mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being." (*People v. Stone* (2009) 46 Cal.4th 131, 134 [92 Cal.Rptr.3d 362, 205 P.3d 272] (*Stone*) [indiscriminate firing of a single shot into a group of 10 to 25 youths supported one generic count of attempted murder].) Here, defendant fired the single shot at the group intending to kill *someone*, but without targeting any particular individual, and without using a means of force calculated to kill everyone in the group. The prosecutor argued to the jury that the evidence established defendant did not have "a specific target in mind" when he fired the single shot at the group and did not intend to "kill everybody" in the group, but rather intended to "kill anybody, wherever that bullet hit." On facts such as these, where the shooter indiscriminately fires a single shot at a group of persons with specific intent to kill *someone*, but without targeting any particular individual or individuals, he is guilty of a single count of attempted murder. (*Ibid.*)

There is no doubt that defendant endangered the lives of every individual in the group into which he fired the single shot. His assault with a firearm against each victim in the group led to his conviction of seven counts of assault with a semiautomatic firearm on a peace officer and one count of assault with a firearm on a civilian victim, for which offenses he could properly be separately punished, subject to Penal Code section 654[1] and applicable sentencing guidelines. On these facts, however, defendant can be found guilty of only a single count of premeditated attempted murder of a peace officer. Accordingly, the judgment of the Court of Appeal will be reversed and the matter remanded to that court for further proceedings consistent with the views expressed herein.

## FACTS AND PROCEDURAL BACKGROUND

Defendant Rodrigo Perez appealed from the judgment entered following his conviction by jury trial of seven counts of premeditated attempted murder of a peace officer (§§ 664, subds. (e), (f), 187, subd. (a)), one count of premeditated attempted murder (§§ 664, 187, subd. (a)), one count of assault with a semiautomatic firearm (§ 245, subd. (b)), seven counts of assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)), and one count of felony vandalism (§ 594, subd. (a)). The jury further found that defendant personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b), (c), (d)) and inflicted great bodily injury as a result of a firearm being discharged from a motor vehicle (§ 12022.5), and that all the offenses were committed for the benefit of a criminal street gang (§ 186.22,

---

[1] All further undesignated statutory references are to the Penal Code.

subd. (b)(1)). Defendant was sentenced on one count of premeditated attempted murder (pertaining to injured peace officer Rodolfo Fuentes) to 15 years to life, plus an enhancement of 25 years to life for personal use of a firearm causing great bodily injury. Sentences on the remaining attempted murder convictions were imposed to run concurrently, and sentences on the convictions of assault with a semiautomatic firearm on a peace officer, as well as all remaining firearm use enhancements, were imposed but stayed pursuant to section 654, for an aggregate prison term of 40 years to life.

On July 1, 2005, Los Angeles police officers who were sitting in an unmarked car across from Christopher Dena Elementary School on East Olympic Boulevard and South Grande Vista Avenue in East Los Angeles saw a car stop in front of the school. Defendant exited from the front passenger seat and, using a can of spray paint, sprayed graffiti that identified the Eighth Street gang on two walls. Defendant then got back into the car, which sped off. A gang expert testified that defendant is a member of the Eighth Street criminal street gang, which is a rival of the Varrio Nueva Estrada (VNE) gang. The Eighth Street gang claims territory bordered on one side by South Grande Vista Avenue; VNE claims the territory on the other side of the street.

On the afternoon of the following day, July 2, 2005, defendant, his girlfriend, Vanessa Espinoza, and Espinoza's cousin, Lissette Guerrero, attended a barbeque in Elysian Park. Guerrero testified that the three left the barbeque after dark. Defendant dropped Guerrero and Espinoza off at defendant's house and drove away. Espinoza testified (under a grant of immunity) that defendant woke her up around 3:00 a.m. the next morning (July 3). Defendant appeared intoxicated and told Espinoza he thought he had shot a cop.

Meanwhile, about 1:30 a.m. on July 3, 2005, officers responded to a report of a carjacking. The car that had been stolen was in an apartment building parking lot abutting the VNE side of Grande Vista Avenue. Officers arrived at the scene and detained some of the carjacking suspects. The carjacking victims were brought to the scene and made positive in-field identifications of the suspects and certain property found in the stolen car.

At one point, eight uniformed officers and one of the carjacking victims, as well as three marked police cars, were in the parking lot. A fourth marked police car was at a nearby corner. One of the officers noticed a car with two people inside turning from East Olympic onto South Grande Vista, about 60 feet away, and driving approximately 10 to 15 miles per hour. A shot was fired from the passenger side window. The shot hit the middle finger of Officer Rodolfo Fuentes, who was standing next to and talking to one of the carjacking victims. Officer Fuentes dropped down (as did the other officers),

pulling the carjacking victim down with him. The car, which appeared to be occupied by two Hispanic males, sped off northbound on Grande Vista.

The parking lot where the officers were standing was illuminated by overhanging lights. There were also some trees between the lot and Grande Vista Avenue. The lighting conditions were described by one officer as "good enough where you can see." Officer Monahan, who was standing alone approximately 20 to 30 feet from the group of eight other officers, described the lighting as "very dim" and "very dark." When the shot was fired, several officers were standing in close proximity to one carjacking victim and the stolen car. As described in the testimony of the various officers, the carjacking victim was standing next to Officer Fuentes; Officer Trujillo was two feet from Fuentes; Officer Meneses was about three feet away; Officer Davis was four to eight feet away; Officer Aguilera was approximately five feet away; Officer Villaneda was 10 to 15 feet away from Officer Fuentes; and Officer Ortega was standing near the group of officers while taking photographs of the victim's car.[2]

The bullet that hit Officer Fuentes almost severed his middle finger, requiring surgery and several days of hospitalization. Investigators established that the trajectory of the bullet continued through a metal security door and the wooden front door of a unit in the nearby apartment building, ultimately striking a kitchen cabinet and bouncing into the bathroom of the unit. The recovered bullet was found to be consistent with a .40-caliber (or a 10-millimeter) semiautomatic handgun, possibly manufactured by Glock. The vehicle used in the shooting was eventually identified as being registered to defendant's girlfriend, Espinoza.

Jose Morales, who testified in the hope of receiving leniency following a nonrelated conspiracy plea, stated he had grown up with defendant. Defendant told Morales that on the night in question he had been drinking with friends and decided to pass by the VNE's territory. When defendant got to a stop sign, he saw some men with bald heads who he thought were VNE gang members. (One officer testified that, at the time of the incident, his head was "shaved." Another officer described his hair as "close shaved.") Defendant told Morales that "he shot and when they ducked that is when he noticed it was police officers, because [of] the flashing . . . from their badges, so he stepped on the accelerator of his car to leave." The gun defendant used was a "Glock" belonging to "Gizmo" (Paul Leyva).

Leyva testified (under a grant of immunity) that he owned a "40 Glock" handgun. Leyva knew defendant as "Creeper," and both belonged to the

---

[2] Officer Monahan was standing alone, approximately 20 to 30 feet from the group of seven officers and the carjacking victim. Defendant was acquitted of the attempted murder and assault counts pertaining to Officer Monahan.

Eighth Street gang. Two days before the shooting, when defendant and Leyva were completing a drug transaction, defendant removed Leyva's gun from his waistband, commenting that it was a nice weapon. When Leyva asked for it back, defendant responded, "[L]et me hold on to it. Let me use it." Leyva agreed, stating he would come back for the gun in two days. Two days later, when Leyva went to retrieve the gun, defendant told him that he was "kind of intoxicated" the night before, had fired a shot "in VNE territory," and then "just sped off home."

The prosecution's gang expert, Officer Joe Vasquez, testified that the Eighth Street gang and the VNE gang were rivals, and that Grande Vista Avenue separates their respective territories. The apartment parking lot where the shooting took place is in VNE territory. The Eighth Street gang commits crimes such as murders, attempted murders, robberies, narcotics sales, driveby shootings, assaults with deadly weapons, sexual assaults, and carjackings. Officer Vasquez was of the opinion that this shooting had been committed in association with, and for the benefit of, the Eighth Street gang.

Testifying in his own behalf, defendant admitted he had in the past been a member of the Eighth Street gang, but claimed his gang activities ceased in 2004. Defendant denied spray painting Eighth Street gang graffiti on the nearby elementary school walls two days before the shooting. He claimed further that on the night of the shooting he drove to an apartment complex to meet a friend. The two smoked marijuana and drank beer. As defendant was driving home, another friend asked for a ride. Defendant drove the friend down Olympic Boulevard, heading toward the Interstate 5 freeway. Defendant turned on Grande Vista Avenue when his friend said, "Who's them fools right there, fool?" Defendant said he did not know who they were, at which point he heard a loud pop and saw his friend holding a gun. The friend told defendant to "step on it, fool," so defendant sped off onto the freeway. The next morning, defendant first heard on the news that a police officer had been shot. He further claimed his conversations with Morales and Leyva did not include an admission that he had fired a gun.

On appeal, defendant asserted that because he fired a single shot, which hit Officer Fuentes, only one conviction of premeditated attempted murder of a peace officer is sustainable on the People's evidence. A majority of the Court of Appeal disagreed, explaining its rationale for affirming the eight attempted murder convictions as follows: "Here, defendant fired at a group of people from a distance of 60 feet. The jury, which heard testimony and viewed exhibits regarding the officers' relative locations, was in a position to determine whether the officers' proximity to each other was such that in intending to kill any of the officers defendant's shooting endangered the lives of all. Indeed, in making these determinations, the jury acquitted defendant of

the count involving the officer who was farthest from Fuentes. Accordingly, defendant's multiple convictions for attempted murder must be affirmed."

One justice dissented below, observing that defendant had fired a single bullet from a slow-moving vehicle at a group of eight people who were standing less than 15 feet from one another. The bullet hit and wounded Officer Fuentes but killed no one. Nor was there evidence that defendant was targeting any particular individual in the group when he fired the single shot. Disagreeing with the majority's conclusion that all eight counts of premeditated attempted murder were supported by substantial evidence because defendant's single shot had "endangered the lives" of everyone in the group, the dissenting justice observed, "Apart from the firing of that one shot, the record contains no evidence that Perez intended to kill anyone," and reasoned, "A single bullet fired at a moderately dispersed crowd from a moving car 60 feet away cannot support a reasonable inference that the shooter intended to kill eight people or that the shooter had the apparent ability to kill all eight people with that one shot."

We granted review, limited to the issue whether sufficient evidence supports defendant's convictions of eight counts of premeditated attempted murder based on his firing of a single shot at the group, which struck Officer Fuentes.

## DISCUSSION

Defendant contends the evidence in this case is insufficient to support his conviction of seven of the eight counts of premeditated attempted murder. "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

" 'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666].)' (*People v. Bland* (2002) 28 Cal.4th 313, 327 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*).) In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' (*People v. Lee*[, *supra*,] 31 Cal.4th 613, 623 . . . ; see

*People v. Swain* (1996) 12 Cal.4th 593, 604–605 [49 Cal.Rptr.2d 390, 909 P.2d 994].)" (*People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730] (*Smith*).)[3]

Thus, in order for defendant to be convicted of the *attempted* murder of each of the seven officers and the civilian in the group into which he fired the single shot, the prosecution had to prove he acted with the specific intent to kill each victim. (*Smith, supra*, 37 Cal.4th at p. 739; *People v. Bland, supra*, 28 Cal.4th at p. 331 (*Bland*).) " '[G]uilt of attempted murder must be judged separately as to each alleged victim.' " (*Stone, supra*, 46 Cal.4th at p. 141, quoting *Bland*, at p. 331.) "[T]his is true whether the alleged victim was particularly targeted or randomly chosen." (*Stone*, at p. 141.)

In *Stone, supra*, 46 Cal.4th 131, we considered the question whether a shooter who fires a single shot into a group of people, intending to kill one of the group, but not knowing or caring which one, can be convicted of a single count of attempted murder. (*Id.* at p. 134.) We answered the inquiry affirmatively, explaining that, "The mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being." (*Ibid.*)

■ With regard to whether the evidence in this case is sufficient to establish that defendant acted with specific intent to kill *someone* in the group he shot at, past decisions have recognized that " '[t]he act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]' (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 [60 Cal.Rptr.2d 761] (*Chinchilla*); see also *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224–1225 [113 Cal.Rptr.2d 1].)" (*Smith, supra*, 37 Cal.4th at p. 741.) Consistent with these principles, a rational trier of fact could find that defendant's act of firing a single bullet at a group of eight persons from a distance of 60 feet established that he acted with intent to kill *someone* in the group he fired upon. "[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Stone, supra*, 46 Cal.4th at p. 140.) Indeed, defendant has acknowledged that "the record supports the conclusion that [he] intended to kill whoever in the crowd was struck by the bullet." Accordingly, on these facts, the evidence is sufficient to support defendant's conviction of one count of premeditated attempted murder of a peace officer.

■ The evidence, however, is insufficient to sustain defendant's convictions of the remaining seven counts of attempted murder. In this case there is

---

[3] It is undisputed that defendant's act of firing a single shot into the group constituted the "ineffectual act" required for attempted murder. (*People v. Lee, supra*, 31 Cal.4th at p. 623.)

no evidence that defendant knew or specifically targeted any particular individual or individuals in the group of officers he fired upon.[4] Nor is there evidence that he specifically intended to kill two or more persons with the single shot. Finally, there is no evidence defendant specifically intended to kill two or more persons in the group[5] but was only thwarted from firing off the required additional shots by circumstances beyond his control.[6] Without more, this record will not support conviction of eight counts of premeditated attempted murder.

The People nevertheless argue that "the presence of seven additional persons surrounding Officer Fuentes combined with [defendant's] intent to shoot any one of them fulfills the established elements of the crime of attempted murder as to each of those persons." Echoing the rationale of the majority of the Court of Appeal in affirming the multiple convictions of attempted murder, i.e., that defendant's shooting "endangered the lives of all" in the group, the People argue that "[i]t was for the jury to determine whether these individuals were 'close enough' to be counted as members of the crowd that [defendant] targeted. Additionally, it was for the jury to determine whether an approximate distance of 60 feet from the shooter to the crowd was 'close range' *and endangered any of them.*" (Italics added.) In support, the People cite *Bland, supra,* 28 Cal.4th 313, and *Smith, supra,* 37 Cal.4th 733. But neither *Bland* nor *Smith* stands for the proposition that to the extent shooting a single bullet at a group of persons endangers them all, the shooter may be found guilty of the attempted murder of every individual in the group on that basis alone. Nor are the facts of either *Bland* or *Smith* apposite here.

In *Bland, supra,* 28 Cal.4th 313, the defendant fired numerous rounds into a car at close range, killing one occupant (the apparent target) and injuring

---

[4] The People concede that "[b]ased on the evidence in this case, a reasonable jury would infer that [defendant] did not have a specific target when he fired into the group of officers from a distance of 60 feet."

[5] The People have also conceded that "[defendant] did not have the apparent ability to kill all eight of the people with a single shot," but argue "he did have the apparent ability to continue shooting until he did kill them all." From that they argue that "a rational jury could have considered that the bullet nearly severed Officer Fuentes' finger, and that it then traveled on and struck a metal screen door, and a wooden cabinet, before bouncing to a rest. A rational jury could have thus found that those strikes supported at least three attempted murder convictions."

The People's argument that each happenstance change in the direction of the bullet's trajectory could somehow support additional separate counts of attempted murder misses the mark. Whether defendant attempted to murder more than one individual in the group he fired upon turns on whether the evidence establishes that he acted with specific intent to kill that additional person or persons. The record, however, is devoid of evidence that after firing off the single shot, defendant intended to continue shooting until he killed everyone in the group.

[6] An example of such circumstances might be where a shooter announces to witnesses that he intends to murder everyone in a group of rival gang members standing on a corner, then shoots at the group but is thwarted when the gun jams after the first shot.

the other two. We considered the facts underlying the defendant's convictions and endorsed a "kill zone" theory in upholding his convictions of one count of murder and two counts of attempted murder. (*Id.* at pp. 318, 329–331.)

*Bland* recognized that intent to kill does not transfer to victims who are not killed, and thus "transferred intent" cannot serve as a basis for a finding of attempted murder. (*Bland, supra,* 28 Cal.4th at pp. 326–331.) Nor does our decision in *Bland* suggest that single-bullet cases involving more than one potential attempted murder victim must be analyzed under a kill zone rationale. "*Bland* simply recognizes that a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. (*Bland, supra,* 28 Cal.4th at pp. 329–330.)" (*Smith, supra,* 37 Cal.4th at pp. 745–746.) *Bland* in turn cited the decision of the Maryland Court of Appeals in *Ford v. State* (1993) 330 Md. 682 [625 A.2d 984], which gave several examples of facts that might support a "kill zone" theory of attempted murder: the placing of a bomb in an airliner when the desire is to kill a particular person on board, the firing of an automatic. weapon at a group of people on the street motivated by the desire to kill one particular person in the group, or the use of an explosive device devastating enough to kill everyone in the group. (*Bland, supra,* 28 Cal.4th at pp. 329–330; see *Ford v. State, supra,* 625 A.2d at pp. 1000–1001.)

█ The facts of this case do not establish that defendant created a "kill zone" by firing a single shot from a moving car at a distance of 60 feet at the group of eight individuals, notwithstanding that they were all standing in relatively close proximity to one another. *Bland*'s kill zone theory of multiple attempted murder is necessarily defined by the nature and scope of the attack. The firing of a single bullet under these circumstances is not the equivalent of using an explosive device with intent to kill everyone in the area of the blast, or spraying a crowd with automatic weapon fire, a means likewise calculated to kill everyone fired upon. The indiscriminate firing of a single shot at a group of persons, without more, does not amount to an attempted murder of everyone in the group. The holding in *Bland* is not controlling on these facts.

This court's decision in *Smith, supra,* 37 Cal.4th 733, is likewise distinguishable from this case. In *Smith* the defendant was standing a few feet behind a car that was pulling away from the curb when he fired a single bullet through the rear windshield, hitting the driver's headrest and barely missing both the driver (the defendant's former girlfriend) and her three-month-old son, who was "secured in a rear-facing infant car seat in the

backseat" directly behind her. (*Id.* at pp. 736–737.) Applying the deferential sufficiency of evidence standard, we affirmed the jury's verdicts convicting the defendant of two counts of attempted murder. We focused first on the fact that the infant was seated directly behind the mother, with both victims (the mother and the infant) plainly "in [the defendant's] direct line of fire." (*Id.* at p. 745.) We concluded the presence of *both* victims in the shooter's direct line of fire, one behind the other, gave him the apparent ability to kill them both with one shot. (See also *People v. Chinchilla, supra,* 52 Cal.App.4th at pp. 685, 690 [single bullet fired at two police officers who were crouched, one behind the other, directly in shooter's line of fire and visible to him, supported two counts of attempted murder].)

We went on in *Smith* to explain why the evidence supported the jury's conclusion that the defendant had acted with specific intent to kill both the mother and the infant. We observed that "evidence that defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both. [Citations.]" (*Smith, supra,* 37 Cal.4th at p. 743.) We explained, "The defense below offered nothing to undercut the force of the inference, drawn by the jury on the People's evidence, that defendant acted with intent to kill *both* victims when he fired off a single round at them from close range, each of whom he knew was directly in his line of fire. Defendant testified he was not the shooter, the implication being that some unidentified shooter must have fired the shot or shots at the car (defendant testified he heard multiple gun shots). The jury disbelieved him. His defense at trial thus furnishes no support for his claim on appeal that the People's evidence was insufficient to establish his intent to kill the baby." (*Ibid.*) Last, we observed that "even if defendant's act of shooting at the baby was done 'without advance consideration and only to eliminate a momentary obstacle or annoyance,' the jury could still infer, from the totality of the circumstances, that he acted with express malice toward that victim. (*People v. Arias* [(1996)] 13 Cal.4th [92,] 162 [51 Cal.Rptr.2d 770, 913 P.2d 980].)" (*Smith, supra,* 37 Cal.4th at pp. 743–744.)[7]

Here, in contrast to the facts of *Smith, supra,* 37 Cal.4th 733, and *People v. Chinchilla, supra,* 52 Cal.App.4th 683, the evidence is insufficient to establish that defendant acted with the intent to kill two or more individuals by firing the single shot at the group of seven officers and a civilian.

Defendant's act of endangering the lives of each individual in the group at which he fired the shot will not go unpunished. He was properly convicted of

---

[7] "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' (*People v. Saille* (1991) 54 Cal.3d 1103, 1114 [2 Cal.Rptr.2d 364, 820 P.2d 588].)" (*Smith, supra,* 37 Cal.4th at p. 739.)

seven counts of assault with a semiautomatic firearm on a peace officer and one count of assault with a firearm on a civilian victim, which convictions were affirmed on appeal, and for which offenses he may be separately punished, subject to the sentencing court's discretion and applicable sentencing guidelines. On these facts, however, we conclude the evidence is sufficient to support but a single count of premeditated attempted murder of a peace officer. (See *Stone, supra*, 46 Cal.4th at p. 140.)[8]

## CONCLUSION

The judgment of the Court of Appeal is reversed for the purpose of remanding to that court with directions to conform the judgment to reflect defendant's conviction of a single count of premeditated attempted murder of a peace officer, and for further proceedings consistent with the views expressed herein. In all other respects the judgment is affirmed.

George, C. J., Kennard, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring.—I concur in the judgment and in the majority's conclusion that defendant's single discharge of a handgun was insufficient to support more than one conviction for attempted murder. I write separately to note my disagreement with the majority's attempt to distinguish *People v. Smith* (2005) 37 Cal.4th 733 [37 Cal.Rptr.3d 163, 124 P.3d 730] (*Smith*), in which I dissented. In my view, *Smith* does not meaningfully differ from the present case, and the majority's attempt to find a distinction results in an unsupportable de facto rule that a single gunshot may of itself give rise to multiple attempted murder convictions *provided* the alleged victims were all " 'in [the defendant's] direct line of fire.' " (Maj. opn., *ante*, at p. 233.) Taken together, today's decision and *Smith* allow multiple convictions for

---

[8] *Stone* explained that in an attempted murder prosecution, where the defendant indiscriminately fires a single shot at a group of two or more persons, "the information does not necessarily have to name a specific victim. Penal Code section 952 states it is sufficient if the charge 'contains in substance, a statement that the accused has committed some public offense therein specified,' which 'may be in . . . any words sufficient to give the accused notice of the offense of which he is accused.' (See also Pen. Code, § 951.) A defendant's right to be informed of the charges 'is satisfied when the accused is advised of the charges against him so that he has a reasonable opportunity to prepare and present a defense and is not taken by surprise by the evidence offered at trial.' (*People v. Ramirez* (2003) 109 Cal.App.4th 992, 999 [135 Cal.Rptr.2d 542].) If the defendant is accused of attempted murder of someone, although not necessarily a specific person, it would be sufficient to allege enough facts to give notice of the incident referred to and that the defendant is charged with attempted murder. For example, in [*Stone*], it would have been sufficient to allege that defendant committed attempted murder, in that on or about October 21, 2005, he attempted to murder a member of a group of persons gathered together in a parking lot in Lemoore, California. Although other ways to charge a case like this no doubt exist, a charge like this example would provide adequate notice of the offense of which defendant was accused." (*Stone, supra*, 46 Cal.4th at pp. 141–142.)

victims positioned "in the line of fire," whether or not any evidence shows the defendant intended his single shot to strike and kill all the victims or even believed it could, and whether or not in the circumstances a single round from the weapon used had any realistic potential to do so. The root of this novel thinking is in *Smith*, which should be overruled rather than distinguished.

A conviction for attempted murder requires both the intent to kill another person and a direct but ineffectual act toward doing so. (*People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176].) When the evidence shows a single shot fired in the direction of a group of people, so that the bullet could, in the ordinary course of events, have struck and killed any one of them (but only one), the jury can rationally find the defendant committed a direct act toward killing one person. (See *People v. Welch* (1972) 8 Cal.3d 106, 118 [104 Cal.Rptr. 217, 501 P.2d 225] [to constitute an attempt, an act must be such " ' "as would ordinarily result in the crime" ' " if not for an interruption or other failure preventing completion].) Where, as in *Smith*, the evidence shows as well a motive to kill one identifiable member of a group (or pair), an inference of intent to kill that particular person arises, and a conviction for attempted murder of that person is proper. (See *Smith, supra,* 37 Cal.4th at pp. 752–753 (dis. opn. of Werdegar, J.).) And where, as here, the evidence shows an undifferentiated but potentially lethal hostility to all members of the group, an inference of an intent to kill *any one* person in the group arises, and a single count of attempted murder charged in that manner is proper. (Maj. opn., *ante,* at pp. 233–234; *People v. Stone* (2009) 46 Cal.4th 131, 140–142 [92 Cal.Rptr.3d 362, 205 P.3d 272].) But in none of the described situations does evidence of a single gunshot, without more, establish either a direct act toward the killing of more than one person or the specific intent to kill multiple victims.

Of course, cases occur where the nature and scope of the attack show an intent to kill everyone within a particular area or group, and the attack constitutes a direct act toward that goal. These are the so-called "kill zone" cases. (See *People v. Bland* (2002) 28 Cal.4th 313, 329–331 [121 Cal.Rptr.2d 546, 48 P.3d 1107]; see also *People v. Stone, supra,* 46 Cal.4th at p. 140 [the kill zone theory is not dependent on the assailant's having an identifiable primary target].) Examples include the use of explosive devices, the spraying of automatic or semiautomatic weapon fire into a location or group, and the introduction of poisoned food into a household. (See *Bland,* at pp. 329–331.) But *Smith* was not a kill zone case, and neither is this one. (Maj. opn., *ante,* at p. 232; *Smith, supra,* 37 Cal.4th at pp. 745–746.)

So too, a single discharge of a firearm might, in some circumstances, support findings the defendant intended to kill multiple victims and committed a direct act toward doing so. If the defendant's marksmanship and his

choice of weapon and ammunition were such that a single shot would ordinarily kill two or more victims, and if the defendant were aware of that probability, both the actus reus and mens rea of attempted murder would arguably be satisfied. But in *Smith*, as here, the evidence showed neither that the defendant's single gunshot could, in the ordinary course of events, be expected to strike and kill more than one victim, nor that Smith intended such an exceptional result. It will be a rare case in which the People can prove an assailant intended to shoot and kill person B by shooting *through* and killing person A, and no such proof was offered in *Smith*, any more than it was here.

Despite the lack of evidence that the defendant in *Smith* was capable, and knew himself to be capable, of killing both victims with a single shot, the present majority characterizes the *Smith* facts—unlike the facts here—as sufficient to support two convictions of attempted murder because both alleged victims, a mother and her infant child, were " 'in [the defendant's] direct line of fire.' " (Maj. opn., *ante*, at p. 233, quoting *Smith*, *supra*, 37 Cal.4th at p. 745.) As my dissenting opinion in *Smith* observed, the evidence actually was to the contrary: the baby, who was in an infant car seat behind his mother, was positioned well *below* the line of Smith's apparent aim at the mother's head. (See *Smith*, at p. 757, fn. 3 (dis. opn. of Werdegar, J.).) But even evidence the victims were positioned so that a single bullet could physically have struck and killed them both would not, by itself, support inferences that the defendant's single shot was intended to, and in the ordinary course of events was expected to, have that result. Without such inferences in *Smith*, neither the mens rea nor the actus reus for two counts of attempted murder was proven.

My purpose is not merely to reopen the debate on *Smith*, but to point out the consequences of perpetuating that decision's error in the present case. Because the majority's only factual distinction between the two cases is the positioning of the victims—assertedly in the " 'line of fire' " in *Smith*, but apparently not so here (maj. opn., *ante*, at pp. 232–233)—prosecutors in future attempted murder cases can be expected to argue that multiple victims were positioned so that a single gunshot could have hit them all, even though evidence may be entirely lacking that the defendant's gunshot was objectively likely, or subjectively expected, to hit more than one person. Appellate courts, in turn, will use the same criterion in deciding whether the evidence was sufficient for multiple convictions. The number of convictions arising from a single shooting will thus come to depend not on whether the defendant was proven to have intended to shoot and kill more than one person and to have committed an act that would ordinarily have had that result if not for bad aim or other failure, as previously required, but on the victims' precise positions at the time of the shooting. The result will be multiple convictions arbitrarily returned and upheld in cases where the evidence established neither the mens rea nor the actus reus for more than one count of attempted murder.

For this reason, *Smith* should be overruled instead of distinguished.

Moreno, J., concurred.