Filed 1/24/14 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C066832 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-064676) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |
| DAVID ALLEN VIRGO, | |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed herein on December 30, 2013, be modified as follows:

1. Remove the first full paragraph on page 10 and replace it with the following paragraph:

During his booking at the jail, defendant was boisterous and loud. He said to everyone present, "I fired 55 rounds. And I didn't get fucking killed. I must be a fucking loser. [¶] I've got priors from way back. I can't believe Jeff [Lieutenant Jeffrey

1

Ausnow] didn't believe me. I told him I had C-4." Then defendant held up his hand and said, "They blew my mother fucking gun apart. Got my finger. Got it right in the side here. The slide wouldn't go back. Blew it apart. So I went for my [SIG Sauer] and reloaded."

2. At the end of the third paragraph on page 12, add the following footnote:

We do not discuss the possible application of the "kill zone" theory to this case. (See *People v. Stone* (2009) 46 Cal.4th 131, 136-142.) The prosecutor did not charge defendant under the theory. He charged him with separate counts of attempting to murder each of the 10 named peace officers "under the traditional theory of attempted murder liability." Also, the jury was not instructed on the "kill zone" theory. The trial court omitted the "kill zone" instruction from the instruction on attempted murder (CALCRIM No. 600), and did so without objection from the prosecution.

3. On page 16, delete the first full paragraph, including footnote 6. Insert the following new paragraph in its place:

We have independently reviewed the in camera hearing transcript and the SET officers' personnel files, and we conclude the trial court committed no error in granting the motion as to only one officer's records and denying it as to all others.

This modification does not change the judgment.

The petition for rehearing is denied.

THE COURT:

NICHOLSON , Acting P. J.

BUTZ , J.

MAURO , J.

2

Filed 12/30/13 (unmodified version)

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C066832 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-064676) |
| v. | |
| DAVID ALLEN VIRGO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Placer County, Colleen M. Nichols, Judge. Affirmed in part and reversed in part.

Law Offices of John F. Schuck and John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Paul A. Bernardino, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II through V.

1

A jury convicted defendant David Allan Virgo of 10 counts of willful, deliberate, and premeditated attempted murder of a peace officer (Pen. Code, §§ 664, subd. (e)/187, subd. (a));[1] 10 counts of assault with a firearm and personally using a firearm against those 10 officers (§§ 245, subd. (d)(2), 12022.5, subd. (a), (d)); two counts of being a felon in possession of a firearm, (former § 12021, subd. (a)(1)); and additional conduct and status enhancements. (§§ 667.5, subd. (b), 12022.53, subd. (c), 12022.5.)

The trial court sentenced defendant to a state prison term of 46 years eight months, plus 75 years to life, calculated as follows: five separate and consecutive terms of 15 years to life on five counts of deliberate attempted murder of a peace officer (§ 664, subds. (e), (f)/187, subd. (a)); plus a 20-year determinate enhancement on one of the attempted murder counts for personally using a firearm; plus four consecutive determinate terms of six years eight months, or one-third of the 20-year term, for the same enhancement on four attempted murder counts (§ 12022.53, subd. (c)).

As to the remaining counts, the court imposed five separate and concurrent terms of 15 years-to-life for the other five attempted murder counts, along with the 20-year enhancements as to each of those counts. It also imposed, and stayed under section 654, sentences on the 10 counts of assault with a firearm on a peace officer and their related enhancements, and the two counts of being a felon in possession of a firearm.

On appeal, defendant raises the following claims:

(1) Substantial evidence does not support 10 counts of willful, deliberate, and premeditated attempted murder;

(2) We must review the trial court's in-camera proceedings on defendant's *Pitchess*[2] motion for abuse of discretion;

---

[1] Subsequent undesignated references to sections are to the Penal Code.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

(3)  The trial court abused its discretion by admitting evidence of defendant's gang membership;

(4)  Certain prejudicial testimony was incurable, despite the court's attempts to cure; and

(5)  These errors constitute cumulative error.

We conclude five of the 10 convictions of attempted murder are not supported by substantial evidence, and we reverse only those convictions.  Except to order corrections to the abstract of judgment, we affirm the judgment in all other respects.[3]

FACTS

In 2006, defendant was a parolee at large, and the Placer County Sheriff's Office (Sheriff) was looking for him.  He had assaulted a man, breaking his nose, and left him unconscious.  The Sheriff issued a bulletin for defendant's arrest.

The bulletin, a be-on-the-lookout bulletin, warned officers that defendant was considered armed and unpredictable, and they should handle the matter with extreme caution.  The Sheriff's warning was based in part on advice the Sheriff had received from the Department of Corrections and Rehabilitation.  That agency had informed the Sheriff that defendant was unpredictable and any arrest should by performed by the Sheriff's Special Enforcement Team (SET), the Sheriff's version of a Special Weapons and Tactics Team (SWAT).

In addition, defendant had told Sheriff officers in an earlier contact he was a member of the Hell's Angels and part of "the Filthy Few," a Hell's Angels enforcer group known for violence.

On October 18, 2006, deputies located defendant at a house on Happy Hollow Lane in Newcastle.  The SET commander, Lieutenant Jeffrey Ausnow, directed the SET

---

[3]  The abstract of judgment omits one of the assault convictions and mislabels the attempted murder statutes.  We order a corrected abstract of judgment be prepared.

3

to report and prepare to respond. Lieutenant Ausnow knew defendant from high school. He also knew defendant had felony convictions involving weapons, ammunitions, and explosives. Lieutenant Ausnow had been informed defendant was an enforcer for the Hell's Angels. And he knew defendant had two active felony arrest warrants, one for possession and discharge of handguns and one for a battery with serious bodily injury.

The SET assembled at the California Highway Patrol office in Newcastle. All SET members were wearing sheriff's uniforms with helmets and body armor vests. Lieutenant Ausnow briefed the team members on the situation. He directed them to do a "surround and call-out," a standard SWAT-type maneuver where deputies stealthily surround a house so the suspect inside cannot escape or hurt others, and then they give the suspect an opportunity to surrender. If things did not go according to plan, Sergeant Wayne Woo, the SET's second in command and the ground commander, was to give orders.

About 10:00 p.m., the SET arrived at the residence and began surrounding it. The small house was situated on a semi-rural lot on the northeast corner of the intersection of Happy Hollow Lane and Powerhouse Road. A driveway accessed the house from Happy Hollow Lane and went along the eastern side of the house, which was also the front of the house.[4]

The SET approached from the northwest along Powerhouse Road and into the backyard of the house, and from there they began to take their positions. The main assault team consisted of Sergeant Woo, Sergeant Robert Franz, and Deputies Jason

---

**4**     The trial witnesses were not consistent in describing which direction the house faced. From comparing photographs of the house with maps, it is apparent the front of the house faced roughly east. We will base our descriptions of the house and its rooms based on that fact.

4

Lockhart and Ben Glau. Their assignment was to go around the north side of the house and take position on the front or east side of the house.

Another team, consisting of Agent Benjamen Machado and Deputy Jeff Swearingen, were assigned to go around the back of the house on the west side, then to the south side of the house and there meet up with Sergeant Woo and his team at the front of the house on the east side.

A third team consisted of Deputies Ty Conners, Ryan West, and Dennis Kemper. This team's responsibility was to cover the southwest corner of the house, including its south and back sides. A fourth team, consisting of Sergeants Dave Powers and Darrell Steinhauer, and Deputy Joshua James Tindall, was assigned to cover the northwest corner of the house, including its north and back sides.

As Agent Machado and Deputy Swearingen approached the house along its south side, they saw a person standing in the driveway speaking on a phone. Both officers announced they were with the sheriff's office, but the subject quickly retreated into the house. Deputy Swearingen radioed to the others that their mission had been compromised.

Agent Machado went onto the front porch. He heard people moving around inside. He pounded hard on the house beneath the front window and yelled, "Sheriff's department. Probation search. Come to the door."

At about that time, Deputies Conners, Kemper, and West were approaching their position on the southwest corner of the house. They heard a noise in a window on the far right of the back of the house. Deputy Conners shined his gun light onto the window and saw two males, one of whom was trying to get out. The deputies announced, "Sheriff's department." The male who had been trying to get out of the window abruptly pushed back and yelled, "Fuck." The two males retreated inside the house. Kemper told the others to take cover.

5

Sergeant Woo and his team took cover behind a Toyota vehicle parked in the driveway parallel to the front door of the house. He began yelling verbal commands, saying, "Sheriff's department. Come out with your hands up." A male from inside the house yelled, "Back up. Back the fuck up. I have a bomb, and I'm going to blow the house up." Sergeant Woo continued to yell commands, and the male inside the house yelled he had C-4 (an explosive), he was going to blow up the house, and everyone needed to move back.

Sergeant Woo decided to forego the previous plan and to introduce tear gas into the house as soon as possible. He gave those orders to Deputy West, who was at the southwest corner of the house, and to Sergeant Powers, who was near the northwest corner of the house. He also ordered the rest of the team to put on their gas masks.

At about that time, Sergeant Woo and the other officers heard gunshots from inside the house. The shots continued intermittently. Sergeant Woo could tell when the shots were fired from the front of the house, from deeper inside the house, or from the back of the house. As the male's voice moved to the area of the front kitchen window, it attracted Sergeant Woo's attention. He then heard a gunshot, saw the bullet come out of that window, and heard it pass over his head. He estimated the bullet passed between five and 10 feet above his head. Deputy Lockhart was standing next to him at that time.

Sergeant Woo, Deputy Lockhart, Sergeant Franz, and Deputy Glau, still taking cover behind the Toyota, heard more shots come from the house toward their direction. Deputy Lockhart heard shots going over his head and hitting tree branches and debris behind him. Sergeant Woo testified that "maybe four to seven" gunshots came out from the front of the house towards his direction during the ordeal.

Sergeant Franz heard rounds entering the trees behind him. Deputy Glau heard a shot go past him every once in a while. He would simultaneously hear a shot, hear the shot hit something behind him, and see glass falling from a window.

6

A police armored vehicle pulled into the driveway about that time behind the parked Toyota, and Sergeant Franz and Deputy Glau took cover behind it. Sergeant Woo and Deputy Lockhart stayed by the Toyota.

Once Sergeant Woo confirmed everyone had their gas masks on, Deputy West and Sergeant Powers began shooting tear gas into the house. After the first volley, the front door opened, and three people came out. They were directed to crawl away from the site. With the door open, Sergeant Woo's team could see inside the house down a hall that ended in a bathroom. A bedroom came off each side of the hall by the bathroom.

After more volleys of tear gas, two more people came out the open front door, one holding a dog. While this group was coming out, Sergeant Franz saw a hand holding a handgun come around the back corner of the hall, and he saw the gun fired. Sergeant Franz yelled, "Gun, gun," and Deputy Glau fired back. When Sergeant Franz saw the handgun, he thought it was going to be used on him. Deputy Glau also saw the gun; he was looking straight down the gun's barrel before he fired at it.

The last group of people to exit the house confirmed to the officers that defendant was the only person who remained inside. Sergeant Woo and Deputy Lockhart moved behind the armored vehicle for cover.

Shots continued to be fired from inside the house. During the first few minutes of the incident, the shots had come from the front of the house. By this time, they seemed to Sergeant Woo to be more isolated towards the back of the house.

Deputies West, Conners, and Kemper were taking cover on the southwest side of the house, with Deputy West firing tear gas into the house on the south and west sides. During this time, they heard gunfire coming from inside the house, but they could not tell whether the shots were being fired in their direction. Deputy West saw muzzle flash once through one of the windows on the back west wall but could not tell where the shot was aimed. Although Deputy West could hear steady gunfire coming from the house, he could not tell where the other gunshots he heard were directed.

Deputy Tindall and Sergeants Steinhauer and Powers were taking cover near the northwest corner of the house. Deputy Tindall was more towards the northwest corner separated somewhat from Sergeants Steinhauer and Powers. After seeing the armored vehicle pull up by the front of the house, Deputy Tindall saw muzzle flash through a window at the back of the house. The flash was linear in shape, meaning to Deputy Tindall that the shot went perpendicular to his position. After hearing the shot and seeing the flash, Deputy Tindall fired into the north wall, believing that was where the threat was originating.

After firing, Deputy Tindall heard a male from inside the house say, "Where are you? Where are you, mother fucker?" Then he saw a second muzzle flash and heard a shot. This flash came from the north side of the house. It was round and flowery, indicating to Deputy Tindall that he was in front of the gun when it was fired. He took cover briefly, realized he was all right, and returned fire. He felt at this point that his life was being threatened.

Located to Deputy Tindall's left, Sergeant Powers, who was shooting tear gas into the house, and Sergeant Steinhauer, who was assisting Sergeant Powers by shining a light at the house, also heard a gunshot and saw a muzzle flash come out of the north side of the house. Both Sergeant Powers and Sergeant Steinhauer could tell the gun had been aimed in their direction because the flash was round, as if they were looking straight at it.

Sergeant Powers began to make verbal contact with defendant. He announced he was from the sheriff's office, and that defendant could exit out the front door if he threw his weapons out. Defendant said he wanted to surrender. Sergeant Powers told him to throw his weapons out the window and exit out the front door with his hands up. After Sergeant Powers made several attempts to get defendant to comply, defendant threw something out the window. Sergeant Powers advised Sergeant Woo of this development by radio. He continued to advise defendant to surrender. Then Sergeant Powers learned by radio that defendant was crawling towards the front door.

8

Defendant appeared in the hall outside the bedroom, empty hands out, and he started crawling out. He took one or two steps, and then collapsed. Sergeant Woo told him to keep crawling towards his voice, but defendant kept saying he could not because he was hurt. Concerned by defendant's refusal to follow his instructions, Sergeant Woo ordered Sergeant Franz to taser defendant. When Sergeant Franz announced he was going to taser him, defendant immediately popped up and quickly crawled to where the officers directed him. He was there taken into custody. His only injuries were superficial cuts to his finger and ear.

Detectives located two handguns on the ground outside the northwest bedroom's window on the north side of the house. One was a Ruger nine-millimeter semi-automatic handgun, and the other was a Czech-made semi-automatic .45-caliber handgun. The slide of the Ruger had been damaged, and it had a dry reddish substance on it. Defendant's fingerprints were on the .45-caliber handgun and its clip.

Detectives located gun casings inside the house. They found five fired casings in the hallway, seven fired casings in the northwest bedroom, two fired casings in the southwest bedroom, and four fired casings in the bathroom. They also found one fired bullet outside the house near where Deputy Tindall took cover, and another fired bullet off the front or east side of the house.

A criminalist from the California Department of Justice, Michelle Terra, conducted a trajectory analysis from the bullet holes found in the house. She could not determine the trajectory of a bullet that was fired through an open door or window, as it left no bullet hole to analyze. However, from examining the intact bullet holes, Terra verified that at least 14 shots were fired from inside the house towards the outside, and of those, 10 actually left the house. One of the shots that was fired from the northwest bedroom exited at a height of approximately five feet seven inches above the ground in the direction of an outbuilding and oak tree. Another shot that was fired from that bedroom exited approximately seven feet above the ground through a window and screen

9

out the back to the west of the property. Another shot was fired high out a kitchen window towards the northeast. And two outgoing shots were fired in the direction of the front porch area, one of which exited at a height of approximately five feet four inches above the ground and over the parked Toyota. Terra also testified that nine of the shots she documented coming from inside the house were aimed at the ceiling.[5]

During his booking at the jail, defendant was boisterous and loud. He said to everyone present, "I fired 55 rounds. And I didn't get fucking killed. I must be a fucking loser. [¶] I've got priors from way back. I can't believe Jeff [Lieutenant Jeffrey Ausnow] didn't believe me. I told him I had C-4." Then defendant held up his hand and said, "They blew my mother fucking gun apart. Got my finger. Got it right in the side here. The slide wouldn't go back. Blew it apart. So I went for my six-hour and reloaded."

Scott and Jolene Truschke were two of the people inside the house who crawled out to safety during the shooting. Scott was the person who was using the phone outside on the driveway when the deputies first approached. He had seen defendant earlier that evening in the house with two guns in his hands. In an interview with police, Scott reported that "Dave got the guns and said, 'Okay.' " "I know he had two guns."

Jolene Truschke also had seen two handguns in the house that evening. In her interview with police, Jolene said defendant had fired six or seven shots. She had also heard defendant say "he ain't going down like that, you know. He ain't getting taken. He's going to go down blazing, you know, guns and all."

---

[5] Terra also documented a total of 57 rounds that went into the house from the outside.

10

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends insufficient evidence supports his 10 convictions of attempted murder of a peace officer and the findings that the 10 attempts were willful, deliberate, and premeditated.  We agree sufficient evidence does not support all 10 convictions, but we conclude sufficient evidence supports five counts of willful, deliberate, and premeditated attempted murder.

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]'  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

" ' "The mental state required for attempted murder has long differed from that required for murder itself.  Murder does not require the intent to kill.  Implied malice -- a conscious disregard for life -- suffices.  [Citation.]"  (*People v. Bland* (2002) 28 Cal.4th 313, 327 (*Bland*).)  In contrast, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." [Citations.]'  [Citation.]"  (*People v. Perez* (2010) 50 Cal.4th 222, 229-230 (*Perez*), fn. omitted.)

Thus, in order for defendant to be convicted of each of the 10 attempted murders he was charged of committing, the prosecution had to prove he acted with the specific intent to kill each victim.  " ' "[G]uilt of attempted murder must be judged separately as to each alleged victim." '  ([*People v. Stone* (2009) 46 Cal.4th 131,] 141 [(*Stone*)],

11

quoting *Bland*, at p. 331.)  '[T]his is true whether the alleged victim was particularly targeted or randomly chosen.'  (*Stone*, at p. 141.)"  (*Perez, supra*, 50 Cal.4th at p. 230.)

" ' "[T]he act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .'  [Citation.]"  [Citations.]' [Citation.]"  (*Perez, supra*, 50 Cal.4th at p. 230.)

To establish specific intent, the prosecution does not need to show defendant intended to kill a particular person.  In *Stone, supra*, 46 Cal.4th 131, our Supreme Court determined a shooter who fires a single shot into a group of people, intending to kill one of the group, but not knowing or caring which one, could be convicted of a single count of attempted murder.  (*Id*. at p. 134.)  The court explained that, "The mental state required for attempted murder is the intent to kill *a* human being, not a *particular* human being."  (*Ibid.*, original italics.)

However, where there are multiple possible victims of the attempted murder, the prosecution must establish that defendant intended to kill each victim for each count charged.  In *Perez, supra,* 50 Cal.4th 222, the high court determined a shooter who fired a single shot from a moving car into a group of seven peace officers and a civilian could be convicted of only one count of attempted murder, not eight.  Where the shooter intended to kill someone, without targeting any particular individual and without using a means of force calculated to kill everyone in the group, he could be guilty of only a single count of attempted murder.  (*Id*. at p. 225.)

In addition to proving defendant intended to kill, the prosecution in this case sought to prove defendant's attempts to kill were willful, deliberate, and premeditated. " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.  [Citations.]  "The process of premeditation . . . does not require any extended

12

period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]" ' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

We have no doubt defendant intended to kill, and that his attempts to kill were willful, deliberate, and premeditated. He told his friends when the sheriffs arrived that he was not going to be taken and he was going to go down with guns blazing. He fired directly at deputies through the open front door. At one point in the shooting, he yelled to the deputies, "Where are you? Where are you, mother fucker?" And he continued firing towards them after that. These facts show defendant reflected on the circumstances and arrived at a judgment. He was going to kill or be killed.

Thus, to affirm each of defendant's 10 convictions of attempted murder, we search the record for substantial evidence indicating defendant committed a direct but ineffectual act toward killing each officer. We look to see if he fired at each of the 10 victims in a manner that could have killed them had defendant's aim been more on target. Obviously, defendant cannot be guilty of attempting to murder someone who is taking cover on the ground outside when defendant fires his gun up into the ceiling.

The information charged defendant with attempting to kill Sergeant Woo, Deputy Lockhart, Deputy Glau, Sergeant Franz, Sergeant Steinhauer, Sergeant Powers, Deputy Tindall, Deputy West, Deputy Conners, and Deputy Kemper. Sufficient evidence supports defendant's convictions of attempting to kill Woo, Lockhart, Franz, Glau, and Tindall.

Woo, Lockhart, Franz, and Glau each testified that multiple shots came their direction when they were taking cover by the Toyota parked in front of the house. All of them heard shots go over their heads and hit things behind them. Sergeant Woo stated four to seven gunshots came out of the front of the house toward him, and he was standing next to the other three. Defendant's firing four to seven shots at four peace

13

officers is sufficient evidence in these circumstances to convict him of attempting to murder each officer.

Sergeants Steinhauer and Powers and Deputy Tindall had taken cover at the northwest corner of the house, with Sergeant Powers firing tear gas. All three of these officers testified to seeing only one shot come out of the northwest bedroom's north window that was aimed at them. The other shot Deputy Tindall saw go out the bedroom's west window was aimed away from him. Under this record, defendant could be convicted of attempting to murder one of the three officers, but not all three.

The strongest evidence is that defendant attempted to kill Deputy Tindall. After shooting into the northwest bedroom and hearing defendant say, "Where are you? Where are you, mother fucker?" Deputy Tindall saw a flash come at him from the north wall of the house. The muzzle flash was round and flowery, indicating Deputy Tindall was in front of the gun when it was fired. He took cover, confirmed he was all right, and returned fire. He felt at that moment that his life was being threatened. This is sufficient evidence to sustain defendant's conviction of attempting to murder Deputy Tindall. Because there is no evidence defendant also fired separate shots at Sergeants Steinhauer and Powers, there is insufficient evidence to sustain the convictions as to them.

As for the other officers, Deputies West, Conners, and Kemper, they provided no evidence that they were directly fired upon. They were positioned at the southwest corner of the house. They heard shots coming from inside and outside the house, but they could not tell where the shots were coming from. The only exception was one shot Deputy West saw leave the back window, but he could not tell where the shot was aimed. This evidence is insufficient to support a conviction of attempted murder against Deputies West, Conners, and Kemper.

The Attorney General argues there is sufficient evidence to support all 10 convictions of attempted murder. She relies on the number of spent casings found inside

14

the house, the 14 outgoing shots found by the trajectory analysis, and defendant's assertion at jail that he fired 55 rounds.

These facts, however, do not demonstrate defendant had a specific intent to kill each officer and that he in fact committed a discrete (or an identified) *direct* but ineffectual act toward killing each one. Many of defendant's shots were aimed up at the ceiling and over where some of the officers were located. The Department of Justice criminalist testified that nine of the 14 shots she determined were made from inside the house went into the ceiling. While defendant may have intended with each shot aimed out at human height to kill every officer he could before he was killed, there was insufficient evidence showing he made a direct but ineffectual shot towards each officer. Without such evidence, all 10 convictions of attempted murder cannot stand.

We need not remand this case for resentencing. The trial court imposed consecutive sentences for the attempted murders of Woo, Lockhart, Glau, Franz, and Tindall (counts one, three, five, seven, and thirteen of the information), the convictions we here affirm. The court imposed concurrent sentences for the attempted murders of the other five officers, Steinhauer, Powers, West, Conners, and Kemper (counts nine, eleven, fifteen, seventeen, and nineteen). Because we reverse only the latter five convictions, we order the clerk of the trial court to prepare an amended abstract of judgment striking the reversed convictions and their enhancements and sentences.

## II

### *Review of* Pitchess *Motion*

Defendant sought to discover any citizen complaints that had been filed against the SET officers accusing them of excessive force, falsification of evidence, and moral turpitude. The court found probable cause to review the personnel files of eight of the officers for complaints of excessive force. It found no probable cause to review any of the officers' personnel files for complaints of falsification of records and moral turpitude.

15

The court conducted an in camera review of the eight officers' personnel files, and it determined only one contained a complaint regarding excessive force. It ordered county counsel to provide the complainants' names and addresses to defense counsel, which it did.

We have independently reviewed the in camera hearing transcript, and we conclude the trial court committed no error in granting the motion as to only one officer's files and denying it as to all others.[6]

### III

### *Admission of Gang Evidence*

Defendant contends the trial court abused its discretion when it admitted evidence he was an enforcer for the Hell's Angels. He claims the evidence of gang membership and his role as an enforcer for the gang was unduly prejudicial. We conclude the court did not abuse its discretion.

The trial court admitted the evidence for the sole purpose of determining whether the actions of the peace officers were lawful when considering the circumstances known by them at that time. Defendant had asserted the defenses of self-defense and excessive force, and the court held the evidence of his alleged gang involvement was relevant to understanding the circumstances under which the officers acted and whether they used reasonable force. However, the court admitted the evidence solely for that purpose. It instructed the jury it was to consider the evidence "solely for the purpose of determining the lawfulness of the actions of law enforcement and no other."

By so limiting the jury's consideration of the evidence, the trial court ensured the evidence would not become unduly prejudicial. The jury was instructed not to consider

---

[6] Defendant also asked us to review the documents presented at the hearing, but he did not take the necessary steps of augmenting the record to include the officers' personnel files.

16

the evidence for its truth, and we presume the jury followed that admonition. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

This case is unlike *People v. Memory* (2010) 182 Cal.App.4th 835, relied upon by defendant, where we found admission of gang evidence to be prejudicial error. In that case, the evidence of that defendant's membership in the Jus Brothers Motorcycle Club was admitted to show the defendant's criminal disposition. Here, the evidence served a much more restricted purpose, and the jury did not consider it for determining defendant's disposition or the truth of his actions. Under this circumstance, the trial court did not abuse its discretion in admitting the evidence for its limited purpose.

IV

*Curing of Prejudicial Testimony*

Responding to a question regarding whether defendant had said he was a suspect in another shooting, a witness stated she recalled something about a killing. Although the court struck the testimony, accepted a stipulation by the parties that the statement was false, and admonished the jury not to consider it, defendant claims the testimony was incurably prejudicial. We disagree.

A.  *Additional background information*

During redirect examination, the prosecutor asked Jolene Truschke, one of the women who crawled out of the house during the shooting, whether she had heard defendant talk about a Detective Addison. She had, but she could not remember clearly what he had said. The prosecutor asked her if defendant had said he was angry with Detective Addison. She said he had not. The prosecutor next asked whether defendant had said anything about being a suspect in a shooting in Penryn. Jolene responded, "I recall something about a killing in Penryn or something. I recall a little bit." Defense counsel objected immediately, and the court sustained the objection and struck the testimony.

17

The prosecution had been attempting to elicit from Jolene evidence of defendant's state of mind immediately before the incident, that he knew he was a suspect in another shooting and believed he was being set up for that shooting by Detective Addison. However, because Jolene had suggested defendant was a suspect in a *killing*, defense counsel asked for a curative instruction. The prosecutor, too, did not know Jolene would use the word "killing" instead of "shooting," and he agreed to stipulate defendant was not a suspect in a killing.

The court agreed to a stipulation by counsel and an admonishment to the jury, and it denied defendant's request for a mistrial. The court thereafter instructed the jury as follows: "[L]ast Tuesday, Miss Jolene Truschke testified. [The prosecutor] asked Miss Truschke about statements made by [defendant] regarding being a suspect in a shooting. Miss Truschke responded, 'I recall something about a killing in Penryn or something.' The prosecution and the defense stipulate that [defendant] was never a suspect in a killing in Penryn. The Court ordered that that testimony was stricken from the record at the time. The parties have agreed to give you a further admonishment specifically that the jury is not to use Miss Truschke's inaccurate statement for any reason and is required to disregard the statement in its entirety. And you'll get this along with the jury instructions as well."

B.      *Analysis*

"Under ordinary circumstances the trial court is permitted to correct an error in admitting improper evidence by ordering it stricken from the record and admonishing the jury to disregard it, and the jury is presumed to obey the instruction. [Citations.]" (*People v. Hardy* (1948) 33 Cal.2d 52, 61.) However, in extreme cases, the error in admitting highly prejudicial evidence cannot by cured where the incompetent evidence goes to the main issue, it was unduly emphasized by the manner in which it was presented to the jury, and where the proof of defendant's guilt is not clear and convincing. (*Id*. at pp. 61-62.)

18

Defendant claims this is a case where the prejudicial effect of the evidence could not be cured. He argues the jury, having heard defendant was a suspect in a killing that involved a shooting, would believe he was a recidivist shooter with a propensity to shoot, and on that basis conclude he intended to kill the officers.

The circumstances surrounding the statement were not so extreme as to prevent any prejudicial effect from being cured. The statement did not go to the primary issue of whether defendant intended to kill the officers. That defendant may have said something to the witness about a killing in Penryn did not admit defendant did the killing, nor did it prove he had the specific intent to kill the officers in this incident.

The statement was not unduly emphasized by the manner in which it was presented to the jury. It was made on redirect examination, and it caught everyone off guard. Because the prosecutor did not know the statement was going to be made, he made no attempt to emphasize it to the jury. To the contrary, the prosecutor stipulated that the statement was false, and the court informed the jury that both the defense and the prosecution stipulated defendant was "never a suspect in a killing in Penryn."

The statement could be cured because, in addition to the reasons just stated, proof of defendant's guilt in attempting to murder peace officers in this case was clear and convincing. Upon hearing the Sheriff was at his location, he announced he was going to go down with guns blazing, and he intentionally shot numerous times at Sergeant Woo and his team and once at Deputy Tindall and his team. There was no reasonable doubt of defendant's guilt, as discussed earlier.

Under these circumstances, we conclude any possible prejudice that may have arisen from Jolene Truschke's testimony and the manner in which it was unexpectedly and briefly blurted out could be cured. Furthermore, any prejudice was in fact cured by the admonishment to the jury and the simple and clear stipulation between the prosecution and the defense.

19

V

*Cumulative Error*

Defendant claims the alleged errors in the proceeding, when considered cumulatively, denied him a fair trial.  Except for the lack of substantial evidence to sustain all 10 convictions, we found no error.  Thus, we also find no cumulative error.

DISPOSITION

The judgment as to counts nine, eleven, fifteen, seventeen, and nineteen are reversed.  The clerk of the trial court is ordered to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment striking the convictions, enhancements, and sentences previously imposed by the trial court on counts nine, eleven, fifteen, seventeen, and nineteen.  The amended abstract must also state defendant was convicted on count twenty under section 245, subdivision (d)(2), assault with a firearm against a peace officer, and that all of the attempted murder convictions were violations of sections "664(e)/187(a)."  In all other respects, the judgment is affirmed.


      NICHOLSON      , Acting P. J.


We concur:



      BUTZ      , J.



      MAURO      , J.