Filed 3/1/21

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>TYRONE FOSTER,<br><br>　　　Defendant and Appellant. | B296856<br><br>(Los Angeles County<br>Super. Ct. No. BA446457) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard S. Kemalyan, Judge.  Affirmed.

Kelly Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, III, IV, V, and VI of the Discussion.

A jury convicted defendant Tyrone Foster of one count of first degree premeditated murder, and five counts of premeditated attempted murder. The jury found true allegations that the crimes were gang related and that Foster personally discharged a firearm. The trial court sentenced Foster to a total term of 90 years to life in state prison.

On appeal, Foster raises five issues, contending that: (1) the trial court erred in admitting statements Foster made to an undercover agent while in jail; (2) there was insufficient evidence to support his conviction for five counts of attempted murder; (3) the standard jury instructions failed to adequately describe the requisite intent element for attempted murder; (4) there was insufficient evidence the shooting was gang related; and (5) the admission of a reference to an uncharged burglary was erroneous and prejudicial. Foster further contends the trial court errors accumulated so as to deprive him of his right to a fair trial.

In the published portion of this opinion, we hold that the evidence was sufficient to support all five counts of attempted murder. In the unpublished portion of the opinion, we conclude the evidence was sufficient to support the gang enhancement allegations. We further conclude the jury instructions were adequate as given and that the trial court committed no evidentiary error. Finding no errors to accumulate, we affirm.

## FACTS AND PROCEEDINGS BELOW

**A.     Prosecution Evidence**

### 1.     *The Shooting*

On the afternoon of March 25, 2016, Robert Ellis went to his usual barbershop located at "the Hut," which was in a strip mall at the corner of South Vermont Avenue and 55th Street. The Hut is a known hangout for the Five Deuce Hoovers and Five One Trouble gangs, and members in both gangs were customers of the barber

2

shop. There had been numerous shootings over many years at the location of the shooting. Ellis, however, was not in the gangs, nor was he wearing anything to suggest he was a gang member.

Ellis's barber informed him that he had a few customers ahead of him, so Ellis went outside. There were about 12 people in the parking lot. The shop was busy because it was a holiday weekend. At about 2:14 p.m., a shooter opened fire on the group and Ellis was shot and killed.

The following events were captured by surveillance cameras, and the videos were played at trial. The videos showed the shooter walking up an alley toward the strip mall. The shooter, whose face was partially obscured by a gray hoodie, ran up, crouched behind a car, and then sprang up and fired seven shots from a semiautomatic firearm. The shooter then ran away. One bullet struck and killed Ellis. The rest of the people in the parking lot fled when the shooting began.

Ellis, who had been shot in the chest, died within moments. The bullet that struck Ellis lodged in his body. No other victims were struck by gunfire. Seven expended .45 caliber casings were found on the ground. As of the time of trial, the gun used in the shooting had not been located.

2.     *Initial Investigation*

On April 14, 2016, law enforcement held a press conference to notify the public of a reward being offered for information regarding the shooting. The information disclosed to the media included a general description of the suspect, surveillance video of the shooting, and published still photographs from the video—including one that zoomed in on the shooter's face. The next day, Detective Eric Crosson of the Los Angeles Police Department received tips identifying five or six different people as the suspect. One of the tips led Detective Crosson to locate a Facebook page for someone

with the profile name "Dolla Sign Fatal." The account included photographs of Foster. Crosson learned Foster's name by speaking with gang officer Robert Smith, who knew Foster.

Geqjuan Perteet was identified as a "friend" on Foster's account. Perteet's Facebook page included photographs of Foster displaying hand signs and wearing Nike basketball shoes that appeared to be the same shoes worn by the shooter.

Detective Crosson obtained search warrants for two residences associated with Foster, several phone records, and Facebook accounts. In one of the residences, officers found mail with Foster's name on it and a shoebox with gang graffiti on it. The records obtained from Facebook revealed a telephone number for a cell phone that was used to upload photographs to the account. After obtaining the cell phone records and cell tower information associated with the number, officers obtained an arrest warrant for Foster.

3. *Foster's Arrest and Statements to an Undercover Agent in Jail*

Foster was arrested on May 5, 2016, and was taken to the 77th Street station. Video footage of Foster showed him walking with the same distinctive gait visible in the video of the shooting (with his feet turned out at the 10 and 2 o'clock position).

The police placed Foster in a cell with an undercover agent, as part of a "*Perkins* operation."[1] The agent was wearing a hidden

---

[1] In *Illinois v. Perkins* (1990) 496 U.S. 292 [110 S.Ct. 2394, 110 L.Ed.2d 243] (*Perkins*), the United States Supreme Court held that a criminal suspect who makes incriminating statements is not entitled to *Miranda* warnings "when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." (*Id.* at p. 294; see *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]; see also *People v. Williams*

4

camera that recorded both video and audio.  Video and audio recordings from the body camera were played at trial.[2]

When Foster first entered the cell, he asked the agent what he was in for and the agent said he was in custody for a "hot one," meaning a murder.  Foster said, "Me too."  Foster asked the agent about the status of his case and the nature of the evidence against him.  The agent talked about his purported offense and told Foster the police had camera footage of his whole face and body, but did not have footage of the shooting itself.  Foster stated that, in his case, the police could not just go off video footage because "if they just got part of me or anything . . . that could be anybody."  He added that the police did not have "my weapon, no clothing, no witness."

The agent asked Foster what "area" he was from, and Foster answered "from 40's."  The agent stated he too was from South Central Los Angeles, and asked Foster if he was "still banging."  Foster answered, "Hell yeah."  Foster agreed that if he was released, he would "have all the respect in the world."

The agent told Foster that "homies" will cooperate with the police, and asked Foster if the police might be looking for someone else in the offense.  Before Foster could answer, the agent asked, "Do you trust him?"  Foster responded, "I don't trust nobody . . . ."  When the agent said, "Hopefully they don't catch him . . . .  Just one

---

(1988) 44 Cal.3d 1127, 1141-1142 [stating *Miranda* "has never been applied to conversations between an inmate and an undercover agent"].)

[2] At trial, the prosecutor played for the jury the entire tape of the *Perkins* conversation, and the jury was provided a transcript as an aid to go along with the tape.  Since Foster does not point to any inaccuracies in the transcript, although it was not admitted into evidence, we rely on it for our summary of the *Perkins* conversation.

less thing you got to worry about," Foster replied, "I think that's the only thing I'm worried about."

After additional conversation, Foster said the person they were discussing had been arrested on a robbery and was in jail. He also said the person drove a Nissan. The agent told Foster to get in touch with him. Foster said, "He Hispanic, bro," and the agent said, "Well, you could still get at him though." Foster responded, "I could tell some of your boys, huh?" The agent agreed, and asked for his name. Foster said, "He don't . . . bang though, but his name is Duke," or "Carlos Duke."[3]

The agent asked if the police had found anything during a search of Foster's residence. Foster said they took an old pair of shoes. The agent asked, "That's . . . not the ones that you had on, right?" Foster responded, "It's close to the color," but they were not the same.

The agent asked Foster, "What enemy . . . they blaming you for?" Foster said, "some Hoovers." The agent asked if there had been people near the person who was hit. Foster said there had been, but that they were too busy running and ducking to get a good look at him. The agent emphasized the importance of destroying any possible evidence, saying Foster should get someone to "destroy that gun," and Foster said he would call someone. Foster spoke with a guard, who told him that no telephone was available at that time. Foster commented that he was not concerned about fingerprints on the gun because he commonly wore gloves.

---

[3] On April 24, 2016, Foster was in a white Nissan Altima being driven by Carlos Duque Molina when it was stopped by the police. The officer who conducted the stop testified that Duque was Latino.

The agent asked Foster what kind of gun he used and Foster said, "a chunky little .45." Foster said the police had little to go on because he had not shouted out his gang's name when he committed the shooting.

4.     *Cell Phone Data*

Officers took Foster's cell phone at the time of his arrest. The phone was later searched. The location data for Foster's phone was consistent with him being in "very close proximity of the crime scene" at the time of the shooting. Usage data for the phone indicated it was used heavily both before and after the shooting, but was turned off for the period between 2:17 p.m. and 2:46 p.m., immediately after the shooting at 2:14 p.m. Later that day, Foster warned someone listed in his contacts as "Duke" to be on alert: "Make sure u stay tucked don't cum out for nothing."

Foster's search history reflected that he began investigating news reports of the shooting on March 25 before the lead detectives had even responded to the scene. His web search results between March 25 and March 27 included a search for "Vermont and 55th shooting," and various other crimes including some committed in South Los Angeles and some committed out of state. On April 27th, he searched for "how long can gunpowder last on your clothes."

5.     *Gang Evidence*

Officer Robert Smith testified as a gang expert. He had extensive experience with the Rollin' 40's gang, and had had numerous encounters with Foster. He had known Foster to be a gang member since at least 2013. The Rollin' 40's mostly had African American members, but also had a small number of Latino members. It was not a rival of any Latino gang, and lived in "relative harmony" with a neighboring Latino gang.

The primary activities of the Rollin' 40's included committing burglaries and shootings. Evidence of specific murders and a bank

7

robbery was presented as predicate, gang-related crimes. Foster had been photographed on prior occasions throwing gang signs with other Rollin' 40's members, including a man who was in custody for attempted murder.

Officer Smith explained that gang members gain status by committing violent crimes, especially against rivals. When asked a hypothetical question based on the facts of the instant shooting, Officer Smith opined that the crime was gang-related. Committing such a shooting would increase the status of the shooter's gang, as well as the shooter's status within the gang. The shooting would also serve the gang's interests by intimidating the public, and strengthening the gang's ability to claim the area and make money in various ways, including demanding "taxes" from businesses located in the gang's territory. Gang members would lose respect for falsely claiming crimes and face "repercussions."

Detective Crosson also testified that the nature of the shooting indicated it was gang-motivated. He explained that committing such a shooting in Five Deuce Hoover territory would be disrespectful of the Hoovers, even if the person actually shot was not himself a member.

Criminal street gangs use graffiti to mark their territory and identify their enemies. At the time of the shooting, there was graffiti across the street from the strip mall. The graffiti claimed Five Deuce Hoover and Five One Troubles control of the area, and asserted a threat against various other gangs, including the Rollin' 40's. The threat against the Rollin' 40's was expressed by crossing out the number "40" with the letter "K" next to it. The designation of a "K" next to the crossed-out number meant those enemies would be killed.

## B.    Defense Case

### 1.    *Tyrone Mena*

Tyrone Mena testified he had known Foster since the ninth grade, lived with him during high school, and stayed in touch thereafter.  Mena had never known Foster to be aggressive or violent.  Mena did not know Foster to be a gang member, but knew that Foster hung out with Rollin' 40's gang members.  Mena had a prior conviction for grand theft, which was not gang related.

### 2.    *Defendant Foster*

Foster testified on his own behalf.  He was 22 years old at the time of the shooting.  He grew up in the territory claimed by the Five One Troubles gang and knew the area of the shooting was territory claimed by that gang.  Foster admitted to the jury he was a member of the Rollin' 40's.  However, he described his participation in the Rollin' 40's as a means of socializing and publicizing his music by lending him "street credit."

Foster denied being the shooter.  He could not remember where he was the day of the shooting, but he commonly visited the general area to visit family and go shopping.

Foster claimed he learned about the shooting through media reports.  A Rollin' 40's member named Jeremiah "Spodey Face" Shaw, who Foster had known since 2012, told Foster he had committed the shooting.  Foster did not remember where or when that conversation occurred.[4]  Foster did not believe Shaw and decided to learn more about the shooting by searching the internet.  Indeed, the shooting was such a popular topic among his fellow

---

[4] Officer Smith testified that Shaw was murdered by gang members sometime after Ellis was killed.  However, Officer Smith was not aware of any connection between the two shootings.  Officer Smith had seen Foster and Shaw together.

Rollin' 40's members that Foster conducted many web searches about it. These searches included a search regarding how long gunshot residue lasted on clothing. He searched that topic because Shaw had expressed concern about it in relation to the shooting at The Hut. Foster did not tell the police about Shaw's statements because he did not want to be a "snitch."

Foster also texted his friend Duke to "stay tucked," which meant to stay inside. Foster sent the message because he feared gang members would commit a retaliatory shooting. Duke, however, was not a Rollin' 40's member. Foster acknowledged he previously had been stopped while in a car with Duke and a Rollin' 40's member named Kayvon Murphy.

As for his recorded jailhouse statements to the undercover agent, Foster asserted he falsely made statements about the shooting to make himself seem dangerous to the cellmate. Foster said the first thing he noticed when he entered the cell was that the agent was Latino, which was significant to him because Latino and African American men commonly did not get along in "gang culture." Moreover, Foster was scared because he previously had been stabbed by Latino individuals.[5] He falsely admitted committing the shooting so he would not appear weak to his cellmate.

When asked what he meant when he told the agent that he was "still banging," Foster said he simply meant "socializing" with

---

[5] Foster testified that in 2013 or 2014, he was walking to a store when he was confronted by "two Hispanic" men, who asked where he was from. By that time, Foster had joined the Rollin' 40's. However, Foster did not mention his gang because he thought doing so might escalate the situation. After Foster and the men exchanged unspecified "words" Foster started to walk away. The men stabbed him in the back.

friends.  He told the agent the gun used in the shooting was a .45 because that's what his friend "Spodey Face" carried.

## C.    Charges and Jury Verdict

An amended information, filed on July 13, 2017, charged Foster with the murder of Robert Ellis (Pen. Code, § 187, subd. (a); count 1),[6] and five counts of attempted willful, deliberate, and premediated murder of additional unnamed victims (§§ 187, subd. (a), 664; counts 2-6).  The information further alleged that Foster intentionally used and discharged a firearm, causing great bodily injury and death (§ 12022.53, subds. (b), (c), & (d)), and that the offenses were gang-related (§ 186.22, subd. (b)(1)(C)).

On December 14, 2017, the jury found Foster guilty of all counts, and found all enhancement allegations to be true.  The trial court sentenced Foster to a total term of 90 years to life in state prison.  This appeal followed.

## DISCUSSION

## I.    Statements Made to *Perkins* Agent

Foster contends that his statements to the *Perkins* agent should have been excluded as involuntary, noting that the agent was older, Latino, and claimed to have committed a murder.  Foster contends these factors created the type of coercive pressure likely to induce false admissions of guilt.  We disagree, and conclude the trial court did not err in admitting the evidence.

### A.    Background Facts

Prior to trial, defense counsel moved to exclude Foster's conversation with the *Perkins* agent.  In the written motion, defense counsel pointed out the agent was Latino, and argued Foster

---

[6] Undesignated statutory citations are to the Penal Code.

11

believed the agent would attack him for being African American.[7] Counsel further noted the transcript of the *Perkins* conversation indicated Foster previously had been attacked and stabbed by Latino individuals.[8]  Counsel argued Foster was naïve due to the fact that he was 22 years old and had never been to prison.  Defense counsel claimed the undercover agent's comments about having committed a murder against a "fool" who "didn't even want to pay taxes" "could only be interpreted as a threat to . . . Foster that he could face the same treatment."  As such, any statements made by Foster were made "under circumstances where . . . Foster needed to deter an immediate threat before him."

During oral argument on the motion, defense counsel asserted that Foster "was unfamiliar with the workings of the county jail system," but knew that he was in heightened danger because jailhouse authorities had placed him in a cell with a Latino man. Defense counsel, however, acknowledged the agent made no threatening move, at no time raised his voice, and spent the conversation laying on a bunk and eating a snack.

---

[7] At trial, it was established that the agent was Latino, approximately 35 years old, and five feet, nine inches tall with a medium build and without visible tattoos.

[8] The portion of the *Perkins* transcript cited by defense counsel is in conflict with Foster's trial testimony.  Foster told the agent that "last year" (i.e., 2015) he had encountered men he thought belonged to a tagging crew.  After exchanging words, Foster turned his back on them and one of them stabbed him.  Foster at no point mentioned the men were Latino, and referred to them as "some little niggas."  In contrast, as noted above in footnote 5, Foster testified at trial he previously had been stabbed by "Hispanic" individuals in 2013 or 2014.

The trial court denied the motion.[9]  The court observed that the tone of the conversation was relaxed, that no threat was made, and that no evidence had been presented to support the assertion that Foster had been naïve or afraid.  The court also rejected counsel's argument that "whenever a Black and Latino are placed in the same small, confined setting, there is a credible threat of violence."  The court found there was no evidence that "in this particular situation" Foster "was scared of [the informant] and therefore made statements that he would not otherwise have given."[10]

### B.    Relevant Legal Principles

Admission of an involuntary confession is barred by the federal and California Constitutions.[11]  (*Colorado v. Connelly* (1986)

---

[9] The trial court stated it had reviewed the transcripts, all exhibits submitted, including the CDs and videos of the conversation.

[10] For the first time on appeal, Foster contends the following comment by the trial court demonstrates it failed to apply the preponderance of evidence standard:  "It is equally compelling to the court to believe [Foster] embraced the individual as a fellow person in custody alleged to have been involved in a murder and as a result he felt safe in confiding in him . . . ."  This isolated comment—made after the court ruled that Foster had not been coerced—does not indicate that the court misunderstood the burden of proof.  Moreover, since we independently review the undisputed evidence on the issue, the trial court's comment has no bearing on the outcome of this appeal.  (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

[11] As previously noted above in footnote 1, a *Miranda* warning is not required when an inmate makes a voluntary statement to an undercover agent.  (*Perkins, supra,* 496 U.S. at p. 294.)  The only issue raised here is whether Foster's statements

479 U.S. 157, 163-167 [107 S.Ct. 515, 93 L.Ed.2d 473]; *People v. Benson* (1990) 52 Cal.3d 754, 778; see U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.)  "A confession may be involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence."  (*People v. Maury*, *supra*, 30 Cal.4th at p. 404.)  However, "[a] psychological ploy is prohibited only when, in light of all the circumstances, it is so coercive that it tends to result in a statement that is both involuntary and unreliable."  (*People v. Mays* (2009) 174 Cal.App.4th 156, 164, citing *Perkins*, *supra*, 496 U.S. at p. 297; see also *People v. Hoyt* (2020) 8 Cal.5th 892, 935.)

When a defendant asserts his or her confession was involuntary, the People bear the burden to demonstrate the statements were voluntary by a preponderance of the evidence. (*People v. Jones* (1998) 17 Cal.4th 279, 296.)  " 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' [Citation.]"  (*People v. Maury*, *supra*, 30 Cal.4th at p. 404.)

### C.    The Trial Court Properly Admitted Foster's Statements to the *Perkins* Agent

In his opening brief, Foster contends "the crucial element of police coercion was present because the police placed a young, gang-

---

were "actually . . . coerced" (*Oregon v. Elstad* (1985) 470 U.S. 298, 310 [105 S.Ct. 1285, 84 L.Ed.2d 222]), and thus "involuntary" (*Dickerson v. United States* (2000) 530 U.S. 428, 444 [120 S.Ct. 2326, 147 L.Ed.2d 405]; see also *Arizona v. Fulminante* (1991) 499 U.S. 279, 285-286, 287, fn. 3 [111 S.Ct. 1246, 113 L.Ed.2d 302]).

affiliated, African American inmate in a locked cell with an older, seasoned, gang affiliated, Latino inmate." We disagree.

First, Foster's behavior during the recorded conversation reveals no race-based fear of the *Perkins* agent or Latinos in general. For example, at one point Foster confided that the friend who could implicate him in the shooting was "Hispanic." When the agent told Foster he could "get at" his friend, Foster responded, "I could tell some of your boys, huh?" Thereafter he revealed that his friend's name was "Carlos Duke." The entire exchange refutes the suggestion that Foster viewed the agent as an adversary based on his race.

In his reply brief, Foster concedes that defense counsel "presented no testimony about racially-motivated violence in the jail," but claims the court credited counsel's arguments that it must consider the racial and cultural issues that arise in custodial settings in Los Angeles County, and "in effect, took judicial notice of that fact." This is not an accurate characterization of the court's ruling. While the court did comment that it "must take into account the racial and cultural issues that permeate the custodial situation in the county," the court immediately followed this observation by adding that it was "bound to follow the law," which "clearly states that unless the court finds a credible threat . . . from the evidence presented, the court is required to deny the motion."

The trial court's general comments about racial and cultural issues in custodial settings, cannot, in and of themselves, serve as the basis for judicial notice of facts sufficient to substantiate Foster's fear—or as a basis to find that he faced a threat of harm. (Cf. *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 197-199 [rejecting the defendant's blanket assertion that the police coerced his confession by placing him in a cell with an older gang member, and explaining that while "[d]eference to seniority could be a factor

15

in some factual settings," the court "will not embrace this theory as a universal principle based only on anecdotal speculation"].)

Nor is the fact that the agent was older than Foster automatically indicative of coercion. During the jail cell conversation, the *Perkins* agent observed he was "a little older than [Foster]."[12] Nothing in the exchange reveals that Foster was intimidated by the agent's age. We cannot assume the mere fact there was an age difference between the two would lead Foster to falsely admit his guilt. (*People v. Rodriguez, supra,* 40 Cal.App.5th at p. 199; see generally *People v. Mays, supra,* 174 Cal.App.4th at pp. 164-165 [summarizing cases that concluded various police deceptive stratagems did not amount to coercion or render a confession involuntary].)[13]

Finally, to the extent Foster relies on *Arizona v. Fulminante, supra,* 499 U.S. 279, to argue the conversation was "coercive under the totality of the circumstances," that reliance is misplaced.

---

[12] The transcript of the *Perkins* conversation also shows the agent at one point referred to Foster as "a young cat."

[13] Foster also suggests he was at a disadvantage because of "pain from a previous stabbing that Tylenol had failed to remedy." The transcript reflects that at one point Foster told the agent he couldn't go to sleep, and that he was going to ask the nurse for a Tylenol. Foster commented that nurse had previously given him two Tylenol pills, but it did not "feel like it did anything," and he had asked the nurse "to give [him] many because [he'd] been stabbed so [he] told them [he] can't sleep." When the agent asked about the stabbing, Foster told him the story of the young "tagging crew" that stabbed him "[l]ike last year." This passing reference to an old wound does not support Foster's assertion that his "physical condition likely affected his decision-making capacity."

16

In *Fulminante*, the defendant was befriended in jail by an inmate who was an informant for the FBI. Over an unspecified period of time (days, if not weeks), the informant repeatedly asked the defendant whether a rumor that he had killed a young girl was true. The defendant repeatedly denied it. (*Arizona v. Fulminante*, *supra*, 499 U.S. at pp. 282-283.) Eventually, the informant told the defendant he knew the defendant had been receiving " 'tough treatment' " from other inmates due to the rumor, and that he could protect him—but only if the defendant confessed. (*Id*. at p. 283.) The defendant then confessed to kidnapping, sexually assaulting, and shooting the victim. (*Ibid*.)

The Supreme Court described the facts as presenting a "close" question (*Arizona v. Fulminante*, *supra*, 499 U.S. at p. 287), but "[a]ccept[ed] the Arizona court's finding, permissible on [the] record, that there was a credible threat of physical violence." (*Id*. at p. 288.) Based on that finding, the court agreed "that [the defendant]'s will was overborne in such a way as to render his confession the product of coercion." (*Ibid*.)

Here, however, the trial court found no evidence whatsoever that Foster was facing a credible threat of violence. Our independent review of the record comports with such a conclusion. Indeed, unlike *Fulminante*, nothing indicates that Foster received "tough treatment" from any inmates, or that the agent demanded a confession from Foster in exchange for Foster's safety. (See *People v. Maury*, *supra,* 30 Cal.4th at p. 404 ["A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions"].) Instead, the record demonstrates Foster's willingness to discuss the case against him, as well as share the steps he took to ensure that the

district attorney would refuse to file charges for lack of sufficient evidence.[14]

In short, Foster's misplaced trust in confiding to a man he believed to be a fellow inmate does not render his statements involuntary. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 283-284; see also *People v. Rodriguez*, *supra*, 40 Cal.App.5th at p. 199 [rejecting the contention that the defendant's confession to an undercover informant, posing as " 'an older gang member,' " was involuntary where there was no evidence to suggest the defendant was pressured and the conversation between the two appeared relaxed and jovial].)

## II.    Sufficiency of Evidence to Support Five Counts of Attempted Murder

Foster was convicted in counts 2 through 6 of the premediated attempted murders of five unidentified victims who were standing next to Ellis when Foster opened fire. Consistent with the information, the verdict forms for the attempted murder counts identified each victim as "a person standing in front of 5507 South Vermont."[15]

---

[14] Foster told the agent early in the conversation that "[t]hey don't got no—my weapon, no clothing, no witness." When he later reiterated that he disposed of the weapon and other evidence, Foster explained, "Because really everything's going to fall— everything's going to off of the DA . . . . It's up to the DA—want to charge [*sic*]" and "the DA going to be, like, hmm, it's not enough, you feel me?"

[15] Foster fired seven shots, and struck Ellis with one of the bullets. The information alleged only five counts of attempted murder, consistent with the testimony at the preliminary hearing

Foster contends the evidence was insufficient to support the five attempted murder counts because the prosecutor did not clearly identify the alleged victims; only Ellis was struck; and Foster did not move his arm when firing, indicating Ellis was his only target.

As explained below, our review of the record discloses sufficient evidence to support the jury's verdicts.

### A.     Relevant Legal Principles

#### 1.     *Standard of Review*

In reviewing a sufficiency of the evidence claim, we review the trial record to determine whether a reasonable trier of fact could have found proof of guilt beyond a reasonable doubt.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  When making this determination, "[w]e view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028.)

#### 2.     *Attempted Murder*

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]"  (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.)  "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime."  (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)  "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice."  (*People v.*

---

that the video showed the group near Ellis contained "at least five" people.

19

*Smith* (2005) 37 Cal.4th 733, 742.)  The fact that the bullet misses its mark or fails to prove lethal, is not dispositive.  (*Ibid.*)

### 3. *Specific vs. Random Targets*

A person who acts with intent to kill in firing at a group of people is "guilty of attempted murder even if he or she intended to kill a random person rather than a specific one." (*People v. Stone* (2009) 46 Cal.4th 131, 141 (*Stone*).)  "Although a primary target often exists and can be identified, one is not required." *(Id.* at p. 140.*)*  In describing this theory, the California Supreme Court explained that "[a]n indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Ibid.*)  Multiple attempted murder convictions can be supported by the same reasoning.  (*Ibid.*; *People v. Medina* (2019) 33 Cal.App.5th 146, 156 ["A jury can reasonably conclude a defendant without a primary target who repeatedly shoots into a crowd with the intent to kill committed multiple counts of attempted murder"]; see also *People v. Thompkins* (2020) 50 Cal.App.5th 365, 396 ["under *Stone* it could be found . . . that [the defendant] intended to kill someone in the crowd—anyone who got in the way of his bullets—and thus attempted to murder each of those victims"].)[16]

---

[16] The absence of a specific target distinguishes this case from the "kill zone" theory.  The kill zone theory applies when the defendant chooses, as a means of killing a specific, targeted individual, to kill everyone in the area in which the targeted individual is located (i.e., the "kill zone") as the means of accomplishing the killing of the targeted victim.  (*People v. Canizales*, *supra,* 7 Cal.5th at pp. 607-608.)  In contrast, the *Stone* theory applies when there is no specifically targeted individual. The two theories are mutually exclusive.  (See *People v. McCloud* (2012) 211 Cal.App.4th 788, 798, 802, fn. 6 (*McCloud*); see also *People v. Thompkins*, *supra*, 50 Cal.App.5th at p. 396, fn. 10 ["*Stone* establishes that the kill zone theory cannot be used when the

In *Stone*, the defendant fired a single shot at a group of approximately 10 people and was charged with the attempted murder of one of the group. (*Stone, supra*, 46 Cal.4th at pp. 135-136.) The prosecutor conceded that there was no evidence the defendant intended to kill a specific targeted individual. (*Id.* at p. 139.)

The Supreme Court held that the prosecutor's concession did not preclude a conviction of attempted murder, but explained that "it would no doubt have been better had the case been charged differently" (*Stone, supra*, 46 Cal.4th at p. 141), such as simply alleging that the defendant "attempted to murder a member of a group of persons gathered together in a parking lot in Lemoore, California." (*Id.* at pp. 141-142.)

Consistent with *Stone*, in Foster's case the information and verdict forms identified each victim as "a person standing in front of 5507 South Vermont." Thus, contrary to Foster's assertions, the victims in counts 2 to 6 were adequately identified. The only question is whether there was sufficient evidence that Foster intended to kill more than one person in the group.

### B. The Evidence Was Sufficient to Support All Five Counts of Attempted Murder

In reviewing Foster's sufficiency claim we are guided primarily by two cases: our high court's decision in *People v. Perez* (2010) 50 Cal.4th 222 (*Perez*), and our own decision in *McCloud, supra*, 211 Cal.App.4th 788. We summarize each below.

---

defendant fires indiscriminately at a crowd of people, not aiming to kill anyone in particular, but hoping to kill as many as possible"].)

The prosecutor here did not rely on a "kill zone" theory and the jury was not instructed on that theory.

### 1.     *Perez*

In *Perez*, the defendant "fired a single bullet at a distance of 60 feet, from a car going 10 to 15 miles per hour, at a group of seven peace officers and a civilian who were standing less than 15 feet apart . . . .  The bullet hit one officer in the hand, nearly severing his finger, but killed no one." (*Perez, supra*, 50 Cal.4th at p. 224.) The defendant was convicted of eight counts of attempted murder. Our high court reversed seven of the convictions, concluding that "the evidence is sufficient to sustain only a single count of premeditated attempted murder of a peace officer." (*Id.* at p. 225.) The court reasoned that "there is no evidence that [the] defendant knew or specifically targeted any particular individual or individuals in the group of officers he fired upon.  Nor is there evidence that he specifically intended to kill two or more persons with the single shot.  Finally, there is no evidence [the] defendant specifically intended to kill two or more persons in the group but was only thwarted from firing off the required additional shots by circumstances beyond his control.  Without more, this record will not support conviction of eight counts of premeditated attempted murder." (*Id.* at pp. 230-231, fns. omitted.)

### 2.     *McCloud*

In *McCloud*, we deemed *Perez* controlling in determining whether there was sufficient evidence to support 46 counts of attempted murder following a group shooting in which 10 shots were fired. (*McCloud, supra,* 211 Cal.App.4th at p. 805.)  The shots were all were fired at a party held at a Masonic Lodge, at which over 400 guests were present.  Three bullets struck three victims, killing two and injuring the third.  The seven remaining bullets hit no one. Officers determined that all 10 casings were from the same semi-automatic weapon.  (*Id.* at p. 794.)

Investigating officers identified five bullet strike marks on the exterior wall of the lodge near the broken window and two bullet holes in a car in the parking lot.  Three bullets passed through the window and struck and lodged in victims Moses, Taylor, and Gaines.  The gun itself was never found.  (*McCloud, supra,* 211 Cal.App.4th at p. 795.)

On appeal, we concluded the evidence was sufficient to support only eight attempted murder convictions "because 10 shots were fired but two of them killed victims Moses and Taylor, for which [the defendant] was separately convicted and punished." (*McCloud, supra,* 211 Cal.App.4th at p. 807.)  Citing *Perez,* we noted there was no evidence that the defendant intended to kill more than one person per bullet and no evidence that the defendant had more than 10 bullets.  (*McCloud, supra*, at p. 807.)  As such, we limited the counts, as in *Perez*, to the number of bullets fired at the crowd. (*Id.* at pp. 806-807.)

### 3.    *Analysis*

Viewing the evidence in the light most favorable to the judgment, there was sufficient evidence to support all five attempted murder convictions.

First, there was no indication Foster had a primary target. There was no preexisting relationship or prior incident between Foster and Ellis, nor any other evidence suggesting Foster specifically targeted Ellis when he opened fire.  The surveillance footage shows that shortly prior to the shooting, there were at least six men tightly grouped in front of a metal roll-up door near the barbershop, with several moving about as they interacted.[17]  The

---

[17] We have reviewed the surveillance footage.  The recordings, filmed from three different locations, show different aspects of the

footage further shows that Foster walked up an alley toward the parking lot, crouched down for cover as he neared a blue sedan, and then rapidly popped up and opened fire on the group. While still firing, Foster walked backward and then ran away.

Second, during his jailhouse conversation with the *Perkins* agent, the agent asked Foster, "What enemy—enemy they blaming you for," to which Foster answered, "some Hoovers." At another point the agent asked if "[t]here was a gang of them," to which Foster responded, "Uh-huh." During the conversation, Foster gave no indication he sought to target a specific individual.

Foster, however, claims the "manner in which the shooting occurred" supports the conclusion "that only Ellis was the intended target." In so arguing, Foster asserts that the surveillance footage shows "the shooter fire[d] seven times with a straight arm" and "did not scatter his shots or move his arm to suggest an attempt to hit multiple targets." Foster further claims there was no evidence to show the unnamed victims were in the line of fire when the bullets were fired. The record does not support such a narrow view.

Foster fired a semi-automatic weapon from a distance of 40 to 50 feet at a group containing at least six males standing so closely to one another that they fit within the frame of the metal door of the barbershop. The surveillance footage shows Foster firing toward the group and walking backward as he continues to fire his rounds. While Foster continues to aim in one direction, his hand is not perfectly steady throughout the shooting. Police officers found three strike marks along the hood of a mini-van parked approximately two car lengths from the metal door, in the line of fire. Officers also found a bullet hole that went through the center

events leading up to and after the shooting, as well as the shooting itself, without sound.

of the metal door, as well as strike marks in the frame and the stucco wall to the left of the door.[18]  The video footage shows the men diving and scattering as bullets ricochet off the stucco wall. Contrary to Foster's assertions, this evidence was sufficient to establish that Foster fired indiscriminately at the group, intending to kill as many as possible with the bullets fired.  (*McCloud*, *supra*, 211 Cal.App.4th at pp. 794, 806-807; see also *People v. Thompkins*, *supra*, 50 Cal.App.5th at p. 397.)  The fact that no one other than Ellis was struck or injured does not negate an intent to kill. (*McCloud*, *supra*, at pp. 806-807; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 [noting that the fact the victim escaped death because of the shooter's poor marksmanship does not necessarily establish a less culpable state of mind].)[19]

---

[18] Foster notes that "[n]o one testified that the strike marks on the metal door were necessarily from the shooting on March 25, 2016," or that "any of the bullets came close to hitting any of the unnamed victims."  However, the surveillance footage—played for the jury and admitted into evidence—shows bullets bouncing off the wall near the frame, and spraying dust, and at least five males standing a few feet from those strikes dispersing and running for cover.  The footage was accompanied by testimony noting the location of Ellis and the group, as well as the shooter, the bullet strikes, and the casings.  (See *People v. Medina, supra,* 33 Cal.App.5th at p. 152, fn. 6 [referencing its review of a surveillance video of a shooting on appeal].)

[19] While we reference the phrase "line of fire" during our discussion, it is important to recognize that cases involving indiscriminate, multi-bullet shootings do not require that the victims be perfectly lined up behind each other.  That narrow interpretation of "line of fire" arises in situations where one bullet is discharged, but the prosecution seeks to charge multiple counts of attempted murder.  (See *Perez, supra,* 50 Cal.4th at pp. 232-233 [distinguishing cases where the "direct line of fire" allowed the

To the extent Foster cites *People v. Virgo* (2013) 222 Cal.App.4th 788 (*Virgo*), to support his insufficiency claim, the analysis in *Virgo* supports, rather than undermines, the jury's verdict in this case.

In *Virgo*, four teams of police officers surrounded a home. The defendant fired at least 14 times from inside the house in various directions. A criminalist determined 10 of the shots exited the house. (*Virgo*, *supra*, 222 Cal.App.4th at pp. 792-796.) The defendant was convicted of 10 counts of premeditated attempted murder of 10 specific, named officers. (*Id.* at pp. 790, 800.)

On appeal, the court determined there was sufficient evidence for five, but not 10 counts of attempted murder. The court's analysis proceeded as follows: One group of four officers testified that multiple shots were fired in their direction, with one officer stating that four to seven gunshots were directed at them; thus sufficient evidence supported the defendant's conviction for attempted murder as to all four officers. (*Virgo*, *supra*, 222 Cal.App.4th at p. 799) As to another group of three officers, the evidence indicated the defendant fired one shot in their direction, and the court therefore concluded that the single shot could support one count of attempted murder, but not three. (*Ibid*.) A third group of officers heard shots, but could not say that any were fired in their direction. Thus no substantial evidence established that the

prosecutor to charge two attempted murder counts from one shot]; *People v. Smith*, *supra,* 37 Cal.4th at pp. 736-737 [the defendant fired a single bullet through a rear windshield, barely missing both the driver and her three-month-old son, who was in an infant car seat directly behind her]*; People v. Chinchilla, supra,* 52 Cal.App.4th at p. 690 [the defendant fired a single bullet at two police officers who were crouched, one behind the other, directly in the line of fire and visible to him].)

defendant committed attempted murder as to the third group. (*Id.* at p. 800.)

Thus, the *Virgo* case turned on whether there existed evidence that shots were fired in the direction of the alleged victims—as demonstrated by the court's prefatory statements prior to conducting its analysis: "We look to see if [the defendant] fired at each of the 10 victims in a manner that could have killed them had [the] defendant's aim been more on target. Obviously, [the] defendant cannot be guilty of attempting to murder someone who is taking cover on the ground outside when [the] defendant fires his gun up into the ceiling." (*Virgo, supra*, 222 Cal.App.4th at p. 799.)

Here, the evidence established that Foster fired a semi-automatic weapon seven times in the direction of at least six individuals in rival gang territory, killing one. Firing a gun at the group, under such circumstances, was substantial evidence from which the jury could find a specific intent to kill, and at least one direct but ineffective step towards killing the five victims who survived the shooting. (*People v. Smith, supra,* 37 Cal.4th at p. 742; see also *People v. Thompkins*, *supra*, 50 Cal.App.5th at p. 397 [stating that under *Stone*, an intent to kill can be inferred from the type of weapon, the number of shots fired, the manner in which the shooter fired, and the circumstances under which he fired, including proximity to his victims.].)

Accordingly, we uphold Foster's conviction as to all five counts of attempted murder.

## III. Attempted Murder Instructions

Foster contends the trial court violated his constitutional rights when it instructed the jury on the attempted murder charges. After instructing the jury as to murder and premeditation, the court gave CALCRIM No. 600 regarding attempted murder as follows:

"The defendant is charged in [c]ounts 2, 3, 4, 5 and 6 with attempted murder.

"To prove that the defendant is guilty of attempted murder, the People must prove that:

"1. The defendant took at least one direct but ineffective step toward killing another person;

"AND

"2. The defendant intended to kill a person. . . ."

The jury received and returned separate verdicts for each of the five counts of attempted murder. Foster contends the jury instructions and verdict forms regarding counts 2 through 6 failed to make clear to the jury that Foster had to intend to kill a separate person in each of those counts. This, in turn, had the effect of omitting an element of the offense, depriving Foster of his constitutional rights.

We disagree. As explained below, our high court rejected a similar challenge to CALJIC No. 8.66, the predecessor to CALCRIM No. 600.[20]

## A. Relevant Legal Principles

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 [124 S.Ct. 1830, 158 L.Ed.2d 701]; *People v. Gonzalez* (2018) 5 Cal.5th 186, 198-199.)

_____

[20] Though Foster failed to object to the attempted murder instruction during trial, we exercise our discretion to consider the argument to determine whether any error affected his substantial rights. (§ 1259; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

28

In reviewing a claim that the trial court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions in the manner asserted by the defendant. (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) We consider the instructions as a whole and " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation]." (*People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)

## B. The Jury Instructions Regarding the Attempted Murder Counts Were Neither Incorrect nor Misleading

In *People v. Ervine* (2009) 47 Cal.4th 745, the defendant was convicted of three counts of attempted murder. The jury was instructed with CALJIC No. 8.66, which instructed that to find the defendant guilty of attempted murder, the jury had to find each of the following elements: " 'One, a direct but ineffectual act was done by one person toward killing *another human being*' "; and " 'two, the person committing such act harbored express malice aforethought, namely, a specific intent to kill unlawfully *another human being*.' " (*Ervine*, *supra*, at p. 787.) The defendant argued "this instruction allowed the jury to convict him of all three counts of attempted murder even if it concluded that he had the specific intent to kill only one of the victims and had committed a direct but ineffectual act toward killing only one of the victims." (*Ibid.*)

Our high court rejected this challenge, finding that it was not "reasonably likely the jury interpreted the instructions in the manner [the] defendant imagines." (*People v. Ervine, supra*, 47 Cal.4th at p. 787.) The court pointed out that "the words 'another human being' and 'another person' in the instructions refer consistently to each alleged victim and are obviously intended to distinguish between the victim and [the] defendant." (*Ibid.*) The

29

court further pointed out the jury was told the defendant was *charged with three separate* counts of attempted murder and was *given a separate verdict form for each victim*, thereby "requiring it to make an individual determination whether [the] defendant had committed the crime against each victim." (*Ibid*.) The court further noted that the defendant failed to "point to anything in the record or in the argument of counsel to support his strained interpretation." (*Ibid*.)[21]

The same holds true here. Both CALCRIM No. 600 and the verdict forms separated the attempted murder charges as to each victim into individual counts. In his closing argument, the prosecutor repeatedly made clear that the burden was on the prosecution to prove that Foster intended to kill both Ellis, as well as each unidentified victim as charged. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1038, 1062 [in determining whether instructions may have the misled jury, the court considers "the totality of instructions and arguments"].)

The prosecutor began his closing argument by listing the charges and allegations, and then said, with regard to the attempted murder charges: "The next allegation that you'll be asked is in the attempted murder which are counts 2 through 6 is whether the other civilians during the attempted murder, whether those were done willful, premeditated and with deliberation. We'll get to that in a little bit more and that will be a finding that you have to make on each of those individuals as true." In discussing the premeditated murder charge, the prosecutor said of Foster, "You pointed a gun at a crowd of people, you wanted to kill those people." Returning to the attempted murder charges, the

---

[21] Although respondent cited to *People v. Ervine* in his brief Foster makes no mention of the case in any of his briefs.

prosecutor repeatedly made the point that Foster could only be convicted of those charges if he intended to kill those unidentified people: "You shoot at somebody with the intent to kill them and miss, that's an attempted murder. . . .  The intent that you have to have is to kill a human being.  Right?  So undoubtedly [Foster] didn't know the entire crowd of people that was standing there in front of the barber shop.  But when he pointed that gun, he fired each round in rival territory, he intended to kill.  And with each round, there were seven rounds.  There's only six counts filed.  There were seven rounds, but with each round he intended to kill . . . ."  The prosecutor subsequently said of Foster, "He pops up, gun in hand and unleashes seven rounds intending to kill his targets."  The same concept was also expressed in the prosecutor's rebuttal argument:  "And it's sad to say that Foster killed a man on March 25th, 2016, and he tried to kill five others.  He tried to kill everybody out in front of that store when he shot."

In light of the instructions given, and the prosecutor's comments, it is not reasonably likely the jury misinterpreted the instructions to convict Foster based on a finding that he harbored an intent to kill only one unidentified person of the group.  Instead, the instructions and arguments adequately informed the jury that in order to convict Foster of the murder of Ellis, and the attempted murder of five additional people, the jury had to find that when he fired seven rounds at the group outside the barber shop, he intended to kill someone with each round.  (See *People v. Thompkins*, *supra*, 50 Cal.App.5th at p. 397 [holding there was sufficient evidence to support all five attempted murder counts charged in the information where the defendant fired indiscriminately at least 10 times].)

Foster also argues the jury could have been misled into believing that it could transfer any mental state regarding Ellis to

the additional five unnamed victims.  However, the jury was instructed with CALCRIM No. 601, which told the jury that if it found Foster guilty of attempted murder under counts 2 through 6, it had to "then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation."  With this instruction, the jury was advised that the mental state for each attempted murder had to be considered separately from the mental state for the murder charge.  Based on its return of verdict forms finding the allegation was true as to each of counts 2 through 6, we conclude that no error occurred.  (See *People v. Ervine, supra,* 47 Cal.4th at p. 788 [CALJIC No. 8.67 directed the jury to determine whether the attempted murder was willful, deliberate, and premeditated, and the jury found each such allegation to be true, defeating the defendant's claim of instructional error].)

To the extent Foster argues that the information and verdicts should have further distinguished between the counts by designating the victims as "Jane Doe 1" or "John Doe 2," no such distinction was necessary.  Each victim was placed into a separately *numbered* count and the jury delivered separate verdicts for each victim by that numerical designation.  (See *People v. Ervine*, *supra*, 47 Cal.4th at p. 787.)  To the extent Foster nevertheless believes that further amplification or clarification would have been helpful or useful, that claim is forfeited.  (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 876-877 [where the instructions given were otherwise correct, the failure to request amplification, clarification, or modification forfeits the claim on appeal].)

Our determination that CALCRIM No. 600 was not likely to have misled the jury necessarily disposes of Foster's claim that trial counsel was ineffective for failing to seek any further amplification. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 [to prevail on a claim

32

of ineffective assistance of counsel, the defendant must show it is reasonably probable that he would have achieved a more favorable result but for counsel's omission or inaction].)

## IV. Sufficiency of Evidence To Support Gang Enhancement

Foster contends the jury's true finding on the gang enhancement must be reversed because there was insufficient evidence to prove the shooting was gang-related. In so contending, Foster points out that the "generalized testimony of a gang expert does not supply substantial evidence of a gang enhancement."

We conclude that ample evidence supported the jury's verdict, including statements made by Foster himself.

### A. Relevant Legal Principles and Standard of Review

As previously stated above in section II, in reviewing the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Griffin, supra,* 33 Cal.4th at p. 1028.) We do not reweigh evidence, reevaluate the credibility of witnesses, or resolve factual conflicts. (*People v. Covarrubias, supra,* 1 Cal.5th at p. 890; *People v. Culver (*1973) 10 Cal.3d 542, 548.)

To prove a gang enhancement, the prosecution must establish that the underlying crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang" (the gang-related prong), "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (the specific intent prong). (§ 186.22, subd. (b)(1); see *People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

The prosecution may rely on expert testimony regarding criminal street gangs to establish a gang enhancement under section 186.22, subdivision (b)(1). (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 [" 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . gang enhancement"]; see also *People v. Albillar*, *supra*, 51 Cal.4th at p. 63 ["Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of [§] 186.22[, subd. ](b)(1)"].) However, the expert's testimony " 'must be rooted in facts shown by the evidence.' " (*Vang, supra,* at p. 1045.) "[P]urely conclusory and factually unsupported opinions" that the charged crimes are for the benefit of the gang are insufficient to support a gang enhancement. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819-820.)

B.     **There Was Sufficient Evidence to Support the Jury's True Finding on the Gang Enhancement Allegations**

Viewing the evidence in the light most favorable to the verdict, substantial evidence supported the gang enhancement. Foster, a longtime gang member, crept up to the hangout of his gang rivals and opened fire. There was no indication Foster knew Ellis or anyone else in the crowd, or had any motive other than causing fear on behalf of his gang. Foster made various admissions during the jail cell conversation with the *Perkins* agent which indicated the crime had been gang-related. This included the fact that he had not shouted out his gang's name, which made it more

difficult for the police investigating the crime.[22]  Foster and the agent also agreed that once he was released from jail, he would "have all the respect in the world."

Officer Smith explained that gang members gain status by committing violent crimes, especially against rivals.  Foster had been photographed on prior occasions throwing gang signs with other Rollin' 40's members, including a man that was in custody for attempted murder.  Smith opined that if a Rollin' 40's member went into a known stronghold in rival gang territory, "creep[ed]" up an alley alongside a car, pulled out a gun and fired seven rounds into a crowd of people, killing one of them, the crime would have been committed to benefit the shooter's gang.  He explained that such a shooting benefits the gang by showing how brazen it is, which enhances its reputation.  It also would benefit the individual shooter's reputation by elevating his status.

Detective Crosson also testified that the nature of the shooting indicated it was gang-motivated.  He explained that committing such a shooting in Five Deuce Hoover territory would be disrespectful of the Hoovers, even if the person killed was not himself a gang member.  Detective Crossen noted that at the time of

---

[22] The relevant conversation was as follows:  After Foster said the police had very little evidence to identify the shooter, and were "going off" of his height, the agent asked, "How they know it's a 40's, first of all?"  Foster said, "They don't."  The agent asked, "You never said 40's?"  Foster replied, "No.  Hell no."  The agent asked again, "You didn't yell out, 40's," and told Foster, "You know how we do it."  Foster said, "[L]ook, listen—listen to me bro.  That's why I don't [sic] they know it's me or nothing though.  At the end of the day . . . because if they thought he was—they thought I was from 40's, they wanted—whatever, it happened, they would have kicked . . . they would have asked the homies . . . .  They would have been showing homies . . . who is this?"

the shooting, there was graffiti across the street from the strip mall, and explained that criminal street gangs use graffiti to mark their territory and to identify their enemies. The graffiti claimed Five Deuce Hoover control of the area, and asserted a death threat against various other gangs, including the Rollin' 40's.

The opinions by Officer Smith and Detective Crosson were supported by evidence concerning the manner in which the crimes were carried out and Foster's active gang membership. (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1261 [rejecting a challenge to the sufficiency of the evidence supporting a gang enhancement because "there was 'an underlying evidentiary foundation' " for the expert's opinion that the crimes were committed for the benefit of the gang].) Accordingly, the testimony by Officer Smith and Detective Crosson, coupled with the evidence supporting their opinions, was sufficient to permit a reasonable trier of fact to find the gang enhancement allegations to be true beyond a reasonable doubt.

Arguing otherwise, Foster cites to *People v. Ochoa* (2009) 179 Cal.App.4th 650 and *People v. Ramon* (2009) 175 Cal.App.4th 843. Those cases are readily distinguishable.

In *Ochoa*, the defendant committed a carjacking. The defendant committed the crime alone, and "made no apparent gang signs or signals during his commission of the crimes." The prosecution's gang expert testified that the defendant was a gang member, and that carjacking was a common crime for members of the gang. (*People v. Ochoa, supra,* 179 Cal.App.4th at pp. 653, 654.) The Court of Appeal found the evidence insufficient to establish that the crime was gang-related, observing the defendant "did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the instant offenses," and there was no evidence the victim saw the defendant's tattoos, that

the crime was committed in claimed territory (or in the territory of a rival), or that the defendant shared the proceeds of the crime with fellow members. (*Id.* at p. 662.)

The evidence was similarly weak in *Ramon*. There, the defendant and another man were found in a recently stolen truck, with a gun on the floor under the driver's seat. The defendant and his companion were both gang members. The expert testified that possessing the truck and gun could facilitate the commission of crimes to benefit the gang. (*Ramon*, *supra*, 175 Cal.App.4th at pp. 847-848.) The Court of Appeal found the evidence insufficient to support a gang enhancement since the expert's opinion established nothing more than "a possible motive" to explain why the crimes were committed. (*Id.* at p. 853.)

Foster's case does not suffer from the same deficiency. The shooting bore the hallmarks of a gang-motivated crime and had no other apparent motive, such as personal financial gain. Foster made various statements acknowledging the crime had been gang-motivated, including the following: (1) When the *Perkins* agent asked Foster if he was "still . . . banging," Foster answered, "Hell yeah"; (2) when the agent asked Foster, "What enemy . . . they blaming you for," Foster said "some Hoovers," and suggested that Hoovers housed in the county jail might attack him; (3) Foster agreed with the agent that if he was released, he would "have all the respect in the world"; and (4) Foster texted his friend "Duke" to "stay tucked" on the day of the shooting, and explained at trial that he did so because he expected a retaliatory shooting by the targeted gang (though he claimed his friend "Spodey Face" did the shooting).

In light of the evidence identified above, Foster's substantial evidence challenge to the gang enhancement determination is without merit.[23]

## V. Admission of Text Messages Referencing an Uncharged Burglary

Foster contends the trial court erred in admitting several text messages found on his cell phone that appear to reference an uncharged burglary. Foster claims the trial court's ruling violated Evidence Code section 1101, subdivision (a) (prohibiting the admission of character evidence when offered solely to prove criminal disposition), and was so prejudicial that it also violated his federal constitutional due process rights. Respondent counters the section 1101 claim is forfeited and without merit in any event; we agree.

---

[23] In his reply brief, Foster notes that cases cited by respondent involve defendants who committed their crimes with other gang members. He states that "[t]he fact that a defendant committed his offense with other gang members contributes greatly to proof of the gang enhancement," citing *People v. Morales* (2003) 112 Cal.App.4th 1176, 1197. However, the reason for this evidentiary ease is because *one* of the ways to establish the offense is gang-related is to show that the underlying crime was committed in association with any criminal street gang. (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484 [explaining that because the statute is worded in the disjunctive, the gang enhancement may be imposed based on either gang association or benefit].) The "in association" prong "may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were 'on a frolic and detour unrelated to the gang.'" (*Ibid.*) Here, as explained above, there was ample evidence that Foster committed the shooting to *benefit* his gang.

### A.    Relevant Facts

People's Exhibit 32 was a printout of text messages found on Foster's phone.  As described above, during the prosecution's case-in-chief, the prosecutor elicited testimony that shortly after the shooting, Foster texted someone listed in his contacts as "Duke": "Make sure u stay tucked don't cum out for nothing."

During the defense case, Foster testified that he knew Duke "from high school football" and that Duke was not a member of the Rollin' 40's.  He texted Duke on the day of the shooting because he was afraid of a retaliatory shooting by the targeted gang.  However, Foster claimed he only texted Duke after his friend Spodey Face confided in Foster that he had "shut down the hut."

Foster described his own participation in the Rollin' 40's as a means of socializing and publicizing his music by lending him "street credit."  He stated he was granted "walk-on" status to the gang, because he went to high school with most of the gang members, and had hung out with them.  As a walk-on member, Foster was allowed to throw their hand gestures, and do everything they could do, but "just not all the way."

After Foster testified, the parties discussed the admissibility of additional text messages included in Exhibit 32.  The text messages included messages sent on March 25, 2016, between Foster and someone named "Bd4," that referenced "Hood Day."[24] Bd4 texted Foster, "Duke sed I kno yall got somethin out dat house fuccin clown," and Foster replied, "He stupid[.]  The lit bit we got aint shit."

Defense counsel objected to the text exchange with Bd4 as irrelevant and prejudicial evidence of a burglary, noting that Officer

---

[24] Officer Smith testified that "Hood Day" is the anniversary date for a specific gang.

Smith had testified that he believed Duke (aka Molina) was in custody for a recent burglary. Defense counsel also argued that Foster's association with Duke was not at issue since he admitted Duke was his friend.

The trial court ruled the text messages between Foster and Bd4 were relevant because (1) "they involve an individual named Duke who has been referenced in this case"; (2) "one of the primary activities of the Rollin' 40's is the commission of burglaries"; and (3) "[Foster] . . . testified and admitt[ed] his gang admission to the Rollin' 40's." The text messages were admitted into evidence after the close of testimony and were not discussed nor summarized during the presentation of evidence.

### B.    Relevant Legal Principles

We review the trial court's rulings on the admission and exclusion of evidence for abuse of discretion. (*People v. Harrison* (2005) 35 Cal.4th 208, 230; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 667-668 [Evid. Code, § 1101]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1123 [relevance]; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 352 [Evid. Code, § 352].)

The trial court has broad discretion in determining the relevance of evidence. (*People v. Crittenden* (1994) 9 Cal.4th 83, 132.) The trial court also has discretion to exclude otherwise admissible evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

" '[W]e review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm.' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11; see also *People v. Hopson* (2017) 3 Cal.5th 424, 459 [stating the trial court's ruling

will be upheld if it is correct under any theory of law applicable to the case].)

### C. Foster Has Forfeited His Evidentiary Challenge Under Section 1101; We Discern No Error in the Trial Court's Ruling in Any Event

On appeal, Foster argues the trial court erroneously admitted the text exchange with Bd4 as rebuttal evidence, contending it was inadmissible under Evidence Code sections 352 and 1101, and amounted to an error of constitutional magnitude.  Because defense counsel objected only that the evidence was irrelevant and unduly prejudicial under Evidence Code section 352, Foster has forfeited any additional claims.  (See *People v. Doolin* (2009) 45 Cal.4th 390, 437-438 [an objection on relevance and Evid. Code, § 352 grounds was inadequate to preserve an Evid. Code, § 1101 argument for appeal]; *People v. Ervine, supra*, 47 Cal.4th at p. 783 [federal constitutional claims are forfeited where not raised at trial].)  The claims are also without merit.[25]

The prosecution's theory of the case was that the shooting was gang related, and that Foster, as a Rollin' 40's gang member, shot at a group of individuals hanging out in Five Deuce Hoover/Five One Troubles territory due to the intense rivalry between those gangs and his own.  This rivalry was memorialized in graffiti across from the scene of the shooting, which included direct

---

[25] Anticipating the forfeiture rule, Foster also argues that trial counsel was ineffective for failing to object on the additional grounds asserted on appeal.  Our merits determination necessarily disposes of Foster's ineffective assistance of counsel claim.  (See *Strickland v. Washington* (1984) 466 U.S. 668, 692 [104 S.Ct. 2052, 80 L.Ed.2d 674] [a defendant must demonstrate both that counsel's performance was deficient and that it resulted in prejudice].)

death threats specifically aimed at Foster's gang.  Officer Smith, the gang expert, testified that the primary activities of the Rollin' 40's included committing burglaries and shootings.

Foster took the stand to counter the prosecution's theory by testifying that he became a "social" member of the Rollin' 40's simply to bolster his music career, and he was not involved in the gang "all the way."  Foster further testified he simply knew Duke from high school football, and that Duke was not a member of the Rollin' 40's.

By taking the stand, Foster " 'put his own credibility in issue and was subject to impeachment in the same manner as any other witness.' " (*People v. Doolin*, *supra*, 45 Cal.4th at p. 438; see also Evid. Code, § 1101, subd. (c).)  Here, the challenged text message exchange took place on the day of the shooting and occurred between Foster and "Bd4"—an individual who had referenced the Rollin' 40's "Hood Day."  Bd4's text message to Foster that "Duke sed I kno yall got somethin out dat house," and Foster's response that, "The lit bit we got aint shit," did indeed suggest Foster participated in criminal activity with Duke.  However, the text exchange was only admitted after Foster took the stand and sought to minimize his role in the gang and suggest that he was entirely naïve—and divorced from—the kind of criminal activities committed by the gang.  In so testifying, Foster essentially sought to imply that he—as an innocent and tangential member of the Rollin' 40's—would have no reason to participate in or carry out any gang related offenses.  To suggest the prosecution had no right to counter the credibility of this presentation with Foster's own words

would allow him to effectively present a one-sided impression, without fair rebuttal.[26]

We also agree with the trial court that the evidence consumed little time, and was not unduly prejudicial under Evidence Code section 352.  The text exchange was admitted into evidence after the close of testimony and was not discussed nor summarized during the presentation of evidence.  It also does not appear that either attorney mentioned the text messages in their closing arguments.[27]

Accordingly, we discern no abuse of discretion in the trial court's admission of the evidence in question.  Because the trial court did not abuse its discretion under state law in admitting this evidence, Foster's claim that its admission violated his constitutional right to a fair trial is also without merit.  (*People v. Riggs* (2008) 44 Cal.4th 248, 292 [to the extent the defendant's constitutional claim was "merely a gloss on the objection raised at trial," it is without merit because the trial court did not abuse its

---

[26] To the extent Foster argues in his reply brief that "the evidence was not admissible on the grounds for which it was admitted," we can, as mentioned earlier, affirm on any basis in the record.  (*People v. Hopson*, *supra*, 3 Cal.5th at p. 459 [stating trial court's ruling will be upheld if it is correct under any theory of law applicable to the case]; *People v. Zamudio*, *supra*, 43 Cal.4th at p. 351, fn. 11 [same].)  Moreover, the trial court's ruling was directly responsive to defense counsel's objection that the text messages were inadmissible as irrelevant and prejudicial under Evidence Code section 352.

[27] During deliberations, the jury sent a note asking for multiple items, including the "text message record."  In response, the court referred them to Exhibit No. 32.  Exhibit 32 contains 21 pages of text messages, with the vast majority of the messages blacked out in redaction.

discretion in admitting the evidence]; see *People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230 & fn. 13 [the admission of evidence violates due process only if no permissible inference may be drawn from it].)

## VI.    Cumulative Error

Foster contends the cumulative effect of the trial errors alleged above denied him due process and compels reversal.  In light of the foregoing discussion, there are not multiple trial errors to accumulate.  (*People v. Capers* (2019) 7 Cal.5th 989, 1017-1018.)[28]

## DISPOSITION

The judgment of the trial court is affirmed in all respects.
CERTIFIED FOR PARTIAL PUBLICATION


FEDERMAN, J.[*]


We concur:


CHANEY, J.


BENDIX, Acting P. J.

---

[28] By letter filed on March 2, 2020, Foster withdrew argument VII in his opening brief, noting that the correction to the minute order he sought with regard to sentencing has been accomplished.

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

44